UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| BOCA RATON FIREFIGHTERS' AND POLICE PENSION FUND, Individually and on Behalf of All Others Similarly Situated, | ) ) ) | No. |
| | ) | |
| Plaintiff, | ) ) | CLASS ACTION |
| | ) | DEMAND FOR JURY TRIAL |
| vs. | ) ) | |
| DEVRY INC., DANIEL HAMBURGER, RICHARD M. GUNST and DAVID J. PAULDINE, | ) ) ) ) | |
| Defendants. | ) ) ) | |

## CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE SECURITIES LAWS

## JURISDICTION AND VENUE

1.      Jurisdiction is conferred by §27 of the Securities Exchange Act of 1934 ("1934 Act").

The claims asserted herein arise under §§10(b) and 20(a) of the 1934 Act, 15 U.S.C. §§78j(b) and

78t(a), and U.S. Securities and Exchange Commission ("SEC") Rule 10b-5, 17 C.F.R. §240.10b-5.

2.      Venue is proper in this District pursuant to §27 of the 1934 Act.  Many of the false

and misleading statements were made in or issued from this District.

3.      DeVry Inc.'s ("DeVry" or the "Company") principal executive offices are located at

3005 Highland Parkway, Downers Grove, Illinois 60515.

4.      In connection with the acts alleged in this Complaint, defendants, directly or

indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to,

the mails, interstate telephone communications and the facilities of the national securities markets.

## INTRODUCTION

5.     This is a securities class action on behalf of all persons who purchased or otherwise acquired the common stock of DeVry between October 25, 2007 and August 13, 2010, inclusive (the "Class Period"), against DeVry and certain of its officers and/or directors for violations of the 1934 Act.  These claims are asserted against DeVry and certain of its officers and/or directors who made materially false and misleading statements during the Class Period in press releases, analyst conference calls, and filings with the SEC.

6.     DeVry is a global provider of educational services and the parent organization of Advanced Academics, Becker Professional Education, Carrington College and Carrington College California, Chamberlain College of Nursing, DeVry Brasil, DeVry University, and Ross University. Through these institutions, DeVry offers a wide array of programs in business, healthcare and technology and serves students in middle school through postsecondary education, as well as accounting and finance professionals.

7.     During the Class Period, defendants issued materially false and misleading statements regarding the Company's business and financial results.  Specifically, defendants failed to disclose that the Company had been engaging in abusive and fraudulent recruiting and financial aid lending practices, thereby increasing DeVry's student enrollment and revenues.  As a result of defendants' false statements, DeVry's common stock traded at artificially inflated prices during the Class Period, reaching a high of $74.25 per share on April 22, 2010.

8.     Then on August 13, 2010, after the market closed, the U.S. Department of Education released data on federal student-loan repayment rates at the nation's colleges and universities.  The data showed that repayment rates were 54% at public colleges and 56% at private non-profit intuitions, compared to just 36% at for-profit colleges.  Specifically, the data showed that the repayment rates at DeVry were a mere 38%.

9.    On this news, the price of DeVry stock dropped 8.76%, or $3.74 per share, from a closing price of $42.71 on August 13, 2010, to a closing price of $38.97 per share on August 16, 2010, the following trading day, on a 234% increase in trading volume.

10.    The true facts, which were known by the defendants but concealed from the investing public during the Class Period, were as follows:

(a)    the Company failed to disclose that it had engaged in improper and deceptive recruiting and financial aid lending practices and, due to the government's scrutiny into the for-profit sector, the Company would be unable to continue these practices in the future;

(b)    the Company failed to maintain proper internal controls;

(c)    many of the Company's programs were in jeopardy of losing their eligibility for federal financial aid; and

(d)    as a result of the foregoing, defendants' statements regarding the Company's financial performance and expected earnings were false and misleading and lacked a reasonable basis when made.

11.    As a result of defendants' false statements and omissions, DeVry common stock traded at artificially inflated prices during the Class Period. However, after the above revelations seeped into the market, the Company's shares were hammered by massive sales, sending them down approximately 46% from their Class Period high.

**PARTIES**

12.    Plaintiff Boca Raton Firefighters' and Police Pension Fund purchased DeVry common stock as described in the attached certification and was damaged thereby.

13.    As set forth above, DeVry is a global provider of career-oriented education services, incorporated in the state of Delaware with principal executive offices located in Downers Grove, Illinois.

14.     Defendant Daniel Hamburger, ("Hamburger") has served as President and Chief Executive Officer of DeVry since July 2004.  During the Class Period, while the price of DeVry stock was artificially inflated, Hamburger sold 123,554 shares of DeVry stock at prices between $55.45 and $57.78 per share, for insider trading proceeds totaling $7,094,805.

15.     Defendant Richard M. Gunst, ("Gunst") has served as Senior Vice President, Chief Financial Officer and Treasurer of DeVry since July 2006.

16.     Defendant David J. Pauldine, ("Pauldine") has, at all relevant times, served as the Executive Vice President of DeVry, and became the President of DeVry University, Inc. in July 2006.  During the Class Period, while the price of DeVry stock was artificially inflated, Pauldine sold 19,000 shares of DeVry stock at prices between $54.74 and $56.04 per share, for insider trading proceeds totaling $1,056,243.

17.     Defendants Hamburger, Gunst and Pauldine (the "Individual Defendants"), because of their positions with the Company, possessed the power and authority to control the contents of DeVry's quarterly reports, press releases and presentations to securities analysts, money and portfolio managers, and institutional investors, *i.e.*, the market.  They were provided with copies of the Company's reports and press releases alleged herein to be misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected.  Because of their positions with the Company, and their access to material non-public information available to them but not to the public, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to and were being concealed from the public and that the positive representations being made were then materially false and misleading.  The Individual Defendants are liable for the false statements pleaded herein.

## FRAUDULENT SCHEME AND COURSE OF BUSINESS

18.     Defendants are liable for: (i) making false statements; or (ii) failing to disclose adverse facts known to them about DeVry. Defendants' fraudulent scheme and course of business that operated as a fraud or deceit on purchasers of DeVry common stock was a success, as it: (i) deceived the investing public regarding DeVry's prospects and business; (ii) artificially inflated the prices of DeVry commons tock; and (iii) caused plaintiff and other members of the Class to purchase DeVry common stock at inflated prices and suffer economic loss when the revelations set forth herein reached the market.

## CLASS ACTION ALLEGATIONS

19.     Plaintiff brings this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of all persons who purchased or otherwise acquired DeVry common stock during the Class Period (the "Class"). Excluded from the Class are defendants and their families, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors, or assigns and any entity in which defendants have or had a controlling interest.

20.     The members of the Class are so numerous that joinder of all members is impracticable. The disposition of their claims in a class action will provide substantial benefits to the parties and the Court. DeVry has more than 70 million shares of stock outstanding, owned by hundreds if not thousands of persons.

21.     There is a well-defined community of interest in the questions of law and fact involved in this case. Questions of law and fact common to the members of the Class which predominate over questions which may affect individual Class members include:

(a)     whether the 1934 Act was violated by defendants;

(b)     whether defendants omitted and/or misrepresented material facts;

5

(c)　　whether defendants' statements omitted material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading;

(d)　　whether defendants knew or deliberately disregarded that their statements were false and misleading;

(e)　　whether the price of DeVry publicly traded securities was artificially inflated; and

(f)　　the extent of damage sustained by Class members and the appropriate measure of damages.

22.　　Plaintiff's claims are typical of those of the Class because plaintiff and the Class sustained damages from defendants' wrongful conduct.

23.　　Plaintiff will adequately protect the interests of the Class and has retained counsel who are experienced in class action securities litigation. Plaintiff has no interests which conflict with those of the Class.

24.　　A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

## BACKGROUND

25.　　As stated above, DeVry is a global provider of educational services and the parent organization of Advanced Academics, Becker Professional Education, Carrington College and Carrington College California, Chamberlain College of Nursing, DeVry Brasil, DeVry University, and Ross University. For example, DeVry University is one of the largest private, degree-granting, regionally accredited, higher education systems in North America, and undergraduate and graduate degree programs are offered in the United States, Canada and online. Chamberlain College of Nursing offers associate, bachelor's, master's and degree completion programs in nursing at its

seven campuses in the United States and online.  Ross University, on the other hand, is one of the world's largest providers of medical and veterinary medical education and is located in the Caribbean country of Dominica with a location in Freeport, Grand Bahama, and Ross University School of Veterinary Medicine, located in St. Kitts.  According to the Company, DeVry's purpose "is to empower its students to achieve their educational and career goals."

### DEFENDANTS' FALSE AND MISLEADING STATEMENTS ISSUED DURING THE CLASS PERIOD

26.     The Class Period begins on October 25, 2007.  On that date, DeVry issued a press release reporting its financial results for the fiscal 2008 first quarter ended September 30, 2007.  The Company reported net income of $26.8 million or $0.37 diluted earnings per share and revenue of $250 million for the quarter.

27.     On this news, DeVry stock closed up 37.62%, or $15.06, to close at $55.09 per share on October 26, 2007.

28.     On November 7, 2007, DeVry issued a press release announcing a 20 percent dividend increase, raising its annual dividend rate from $0.10 to $0.12 per share.

29.     On December 6, 2007, DeVry issued a press release announcing the Company's 2007 fall term enrollment at DeVry University, which included a 10.7% increase in new undergraduate student enrollment for fall 2007 to 13,204 students and a 10.3% increase in total undergraduate student enrollment to 44,594 students.

30.     On January 24, 2008, DeVry issued a press release announcing the Company's financial results for the fiscal 2008 second quarter ended December 31, 2007.  The Company reported net income of $35.8 million or $0.49 diluted earnings per share and revenue of $273.7 million for the quarter.

31.     On April 24, 2008, DeVry issued a press release announcing the Company's financial results for the fiscal 2008 third quarter ended March 31, 2008. The Company reported net income of $38.3 million or $0.53 diluted earnings per share and revenue of $291 million for the quarter.

32.     On April 25, 2008, while the price of DeVry stock was artificially inflated, Hamburger sold 16,735 shares of DeVry stock at prices between $55.44 per share and $57.46 per share, for insider trading proceeds totaling $945,687.

33.     On May 13, 2008, DeVry issued a press release announcing that its Board of Directors had declared a semi-annual dividend on the Company's common stock of $0.06 per share, payable on July 10, 2008, to common stockholders of record as of June 19, 2008.

34.     On May 19, 2008, DeVry issued a press release entitled "DeVry Reports Cooperation in Government Inquiry," announcing that earlier in the month the Department of Justice, Civil Division, requested that DeVry voluntarily furnish documents and other information regarding its policies and practices with respect to recruiter compensation and performance evaluation. The press release stated in pertinent part, as follows:

> DeVry Inc., a global provider of educational services, reported that earlier this month the Department of Justice, Civil Division, requested that DeVry voluntarily furnish documents and other information regarding its policies and practices with respect to recruiter compensation and performance evaluation. The request was made in order to examine allegations that DeVry may have submitted or caused the submission of false claims or false statements to the U.S. Department of Education. DeVry has informed the Office of the U.S. Attorney for the Northern District of Illinois, which is working with the Department of Justice, that it will cooperate fully with the inquiry and furnish the requested information and documents.

> "As part of our long-standing commitment to quality and integrity, we believe that DeVry's recruiter compensation is structured in accordance with all governing rules and regulations," said Daniel Hamburger, president and chief executive officer of DeVry. "Since 1982 DeVry has had a comprehensive compliance program to ensure adherence with federal and state regulations and standards. These measures include dedicated regulatory and compliance personnel, standardized policies and procedures, and a system of internal quality control and audit. We look forward to demonstrating to the Government the strength and effectiveness of our compliance program."

35.    On this news, the price of DeVry stock decreased $2.47, or 4.36%, from a closing price of $56.67 on May 16, 2008 to a closing price of $54.20 on May 19, 2008.

36.    On August 14, 2008, DeVry issued a press release announcing the Company's "record" financial results for the fiscal 2008 fourth quarter and full year ended June 30, 2008.  The Company reported net income of $24.6 million or $0.34 diluted earnings per share and revenue of $276.8 million for the quarter.  The Company reported net income of $125.5 million or $1.73 diluted earnings per share and revenue of $1,091.8 million for the year ended June 30, 2008.

37.    On October 21, 2008, DeVry issued a press release announcing the U.S. Department of Justice had informed DeVry that it declined to intervene in a lawsuit alleging DeVry submitted false claims to the U.S. Department of Education in violation of the False Claims Act.  The decision not to intervene came after the Department of Justice concluded its previously-announced inquiry into the allegations.

38.    On October 23, 2008, DeVry issued a press release announcing the Company's financial results for the fiscal 2009 first quarter ended September 30, 2008.  The Company reported net income of $34.8 million or $0.48 diluted earnings per share and revenue of $303.7 million for the quarter.

39.    On November 3, 2008, Pauldine sold 7,000 shares of DeVry common stock at prices between $54.74 per share and $55.02 per share for insider trading proceeds totaling $383,763.

40.    On November 13, 2008, DeVry announced that it was increasing its annual dividend payment by 33% from $0.12 to $0.16 per share annually.  Payable on a semi-annual basis, the Company announced the next dividend payment of $.08 would be made January 9, 2009.

41.     On December 4, 2008, DeVry issued a press release announcing fall 2008 enrollment at DeVry University, including an increase of 19.7% in new undergraduate student enrollment to 15,811 students and an increase of 16.9% in total undergraduate enrollment to 52,146 students.

42.     On January 27, 2009, DeVry issued a press release reporting the Company's financial results for its fiscal 2009 second quarter ended December 31, 2008. The Company reported net income of $42.9 million or $0.59 diluted earnings per share and revenue of $369.6 million for the quarter.

43.     On February 3, 2009, while the price of DeVry stock was artificially inflated, Hamburger sold 39,999 shares of DeVry stock at $57.50 per share, for insider trading proceeds of $2,299,943.

44.     On April 23, 2009, DeVry issued a press release reporting the Company's "record revenues driven by favorable enrollment trends" and financial results for its fiscal 2009 third quarter ended March 31, 2009. The Company reported net income of $50.9 million or $0.70 diluted earnings per share and revenue of $391.9 million for the quarter.

45.     On May 13, 2009, DeVry issued a press release announcing a semi-annual cash dividend on the Company's common stock of $0.08 per share on July 9, 2009.

46.     On August 13, 2009, DeVry issued a press release reporting its "record" earnings for its fiscal 2009 fourth quarter and full year ended June 30, 2009. The Company reported net income of $37 million or $0.51 diluted earnings per share and revenue of $396.2 million for the quarter. The Company reported net income of $165.6 million or $2.28 diluted earnings per share and revenue of $1,461.5 million for the year.

47.     On October 15, 2009, while the price of DeVry stock was artificially inflated, Hamburger sold 1,200 shares of DeVry stock at $57.52 per share for insider trading proceeds of $69,024.

48.     On October 27, 2009, DeVry issued a press release reporting its "record" earnings for its fiscal 2010 first quarter ended September 30, 2009.  The Company reported net income of $54.7 million or $0.76 diluted earnings per share and revenue of $431 million for the quarter.

49.     On October 28, 2009, while the price of DeVry stock was artificially inflated, Hamburger sold 15,432 shares of DeVry stock at $57.56 per share for insider trading proceeds of $888,266.

50.     On November 2, 2009, while the price of DeVry stock was artificially inflated, Pauldine sold 12,000 shares of DeVry common stock at $56.04 per share for insider trading proceeds of $672,480.

51.     On November 11, 2009, the Company issued a press release announcing a 25% dividend increase, raising its dividend from $0.16 to $0.20 per share annually, payable on a semi-annual basis with the next dividend payment to be made on January 7, 2010.

52.     On December 8, 2009, DeVry issued a press release announcing increased enrollment for fall 2009.  The December 8, 2009 press release stated total enrollment at DeVry University had increased 22.7% to 64,003 students; total enrollment at Chamberlain College of Nursing increased 67.2% to 5,617 students and total enrollment at Apollo College and Western Career College increased 14.8% to 11,695 students.  Hamburger commented on the results, in pertinent part, as follows:

> *We are quite pleased with the enrollment growth and retention for all of our schools, which experienced strong demand across all programs, from technology to business to healthcare, and delivery modalities, from campuses to online . . . . We*

11

expect that DeVry's diversified array of educational offerings will continue to serve us well in both good and bad economic times.

We are not only proud of our results, but also of the fact that we are providing access to education to many students, who achieve quality outcomes, and who otherwise would not have had the opportunity to advance their education

53.     From December 9, 2009 through December 14, 2009, while the price of DeVry stock was artificially inflated, Hamburger sold 50,188 shares of DeVry stock at prices between $57.50 per share and $57.78 per share, for insider trading proceeds totaling $2,891,885.

54.     On January 26, 2010, DeVry issued a press release reporting results for its fiscal 2010 second quarter ended December 31, 2009. The Company reported net income of $72.5 million or $1.00 diluted earnings per share and revenue of $473 million for the quarter. Hamburger commented, in pertinent part, as follows:

At a time when state budget cuts and shrinking endowments are making it difficult for colleges and universities to meet the increasing demand for quality education in this country, the private sector is playing an important role in helping to educate our country's workforce and ensuring that we remain competitive in the global marketplace.

We are proud to be a part of the solution and are committed to helping our students meet their career aspirations.

55.     On April 22, 2010, DeVry issued a press release reporting results for its fiscal 2010 third quarter ended March 31, 2010. The Company reported net income of $81.2 million or $1.12 diluted earnings per share and revenue of $504.4 million for the quarter. Hamburger commented, in pertinent part, as follows:

***We continued to achieve favorable enrollment trends during this quarter, as students were attracted by the value proposition of our educational offerings, which includes high quality programs and services and a strong track record of academic outcomes for students . . . . We remain committed to investing in quality and providing the access and capacity needed to educate our country's workforce to compete in the midst of a tough economy.***

56.     On this news, on April 22, 2010, the price of DeVry common stock hit its class period high of $74.25.

57.     On May 18, 2010, defendants announced the Company was issuing a semi-annual dividend of $.10 per share, payable on July 8, 2010.

58.     On June 10, 2010, Senator Tom Harkin, chair of the U.S. Senate's Health, Education, Labor and Pensions Committee, announced that he would be holding a series of hearings to examine federal spending at for-profit colleges.  The press release provided in pertinent part:

> Senator Tom Harkin (D-IA), Chairman of the Health, Education, Labor and Pensions (HELP) Committee, today announced that he plans to hold a series of hearings to examine federal education spending at for-profit higher education institutions.  The hearings will begin June 24th.

> "In the past two years we have made major new investments to expand federal financial aid," said Harkin.  "Pell Grants and student loans now provide more than $20 billion to for-profit higher education companies every year.  We need to ensure for-profit colleges are working well to meet the needs of students and not just shareholders.  We owe it to students and taxpayers to make sure these dollars are being well spent."

> Between 1998 and 2008 the for-profit sector has grown from 550,000 students to 1.8 million, a 225 percent increase.  Students at for-profit institutions are borrowing more, and more frequently, than their peers at non-profit schools, and according to the Department of Education, one in five students who left a for-profit college in 2007 defaulted on their loan within three years.

> The Committee will examine a broad range of issues related to the growing role of the for-profit higher education sector, including the scope and rapid growth of the federal investment in for-profit higher education and the corresponding opportunities and risks for students and taxpayers.  Details on the first hearing will be available in the coming weeks.

59.     On June 16, 2010, the U.S. Department of Education announced that it was proposing new tougher regulations on the industry designed to protect college students and taxpayers from abusive or fraudulent practices.

60.     On June 24, 2010, the Senate held the first of its hearings entitled "Emerging Risk? An Overview of the Federal Investment in For-Profit Education."

61.     By the end of June 2010, DeVry's stock was trading at $52.49, down 29% from its Class Period peak of $74.25 on April 22, 2010.

62.     On July 15, 2010, DeVry submitted responses to questions from the United States Senate Committee on Health, Education, Welfare and Pensions, which were raised by Senate Committee members regarding testimony given before a hearing on "Emerging Risk? An Overview of the Federal Investment in For-Profit Education."

63.     On August 3, 2010, news began to leak into the market concerning the findings from an undercover operation conducted by the U.S. Government Accountability Office ("GAO") on recruiting techniques used in the for-profit higher education industry.

64.     As a result, on August 3, 2010, DeVry stock declined $2.26, or 4.15%, from a closing price of $54.50 on August 2, 2010, to a closing price of $52.24 on August 3, 2010. As news continued to come out concerning details of the government's investigation and the anticipated repercussions from the investigation on DeVry's business and prospects, DeVry stock continued to decline.

65.     For example, on August 3, 2010, *The New York Times* published an article entitled "For-Profit Colleges Mislead Students, Report Finds," stating in pertinent part, as follows:

> Undercover investigators posing as students interested in enrolling at 15 for-profit colleges found that recruiters at four of the colleges encouraged prospective students to lie on their financial aid applications – and all 15 misled potential students about their programs' cost, quality and duration, or the average salary of graduates, according to a federal report.

> The report and its accompanying video are to be released publicly Wednesday by the Government Accountability Office, the auditing arm of Congress, at an oversight hearing on for-profit colleges by the Senate Committee on Health, Education Labor and Pensions.

> The report does not identify the colleges involved, but it includes both privately held and publicly traded institutions in Arizona, California, Florida, Illinois, Pennsylvania, Texas and Washington, D.C. According to the report, the colleges in question were

chosen because they got nearly 90 percent of their revenues from federal aid, or they were in states that are among the top 10 recipients of Title IV money.

The fast-growing for-profit education industry, which received more than $4 billion in federal grants and $20 billion in Department of Education loans last year, has become a source of concern, with many lawmakers suggesting that too much taxpayer money is being used to generate profits for the colleges, instead of providing students with a useful high-quality education.

The report gave specific instances in which some colleges encouraged fraud. At one college in Texas, a recruiter encouraged the undercover investigator not to report $250,000 in savings, saying it was "not the government's business." At a Pennsylvania college, the financial representative told an undercover applicant who had reported a $250,000 inheritance that he should have answered "zero" when asked about money he had in savings – and then told him she would "correct" his form by reducing the reported assets to zero, a change she later confirmed by e-mail and voicemail.

At a college in California, an undercover investigator was encouraged to list three nonexistent dependents on the financial aid application.

In addition to the colleges that encouraged fraud, all the colleges made some deceptive statements. At one certificate program in Washington, for example, the admissions representative told the undercover applicant that barbers could earn $150,000 to $250,000 a year, when the vast majority earn less than $50,000 a year. And at an associate degree program in Florida, the report said, a prospective student was falsely told that the college was accredited by the same organization that accredits Harvard and the University of Florida.

According to the report, courses in massage therapy and computer-aided drafting that cost $14,000 at a California for-profit college were presented as good values, when the same courses cost $520 at a local community college.

Six colleges in four states told the undercover applicants that they could not speak with financial aid representatives or find out what grants and loans they were eligible for until they completed enrollment forms agreeing to become a student and paid a small application fee.

And one Florida college owned by a publicly traded company told an undercover applicant that she needed to take a 50-question test, and answer 18 questions correctly, to be admitted – and then had a representative sit with her and coach her through the test. A representative at that college encouraged the applicant to sign an enrollment contract, while assuring her it was not legally binding.

But in some instances, the report said, the applicants were given accurate and helpful information, about likely salaries and not taking out more loans than they needed

66.     On August 4, 2010, the GAO issued its report detailing its findings. At the request of Congress, the GAO undertook its investigation to determine if for-profit colleges engaged in fraudulent, deceptive or otherwise questionable marketing practices. The GAO's report cited many instances of abuse in the sector, finding that many of the companies in the industry – such as DeVry – employed fraudulent and deceptive practices in their student recruitment, targeting students who used federal financial aid to pay for their schooling. The study was presented at a Senate education hearing held on August 4, 2010, as part of the ongoing government inquiry into the for-profit education sector. This was the second of the Senate's hearings on the industry, and was entitled "For Profit Schools: The Student Recruitment Experience."

67.     On August 6, 2010, DeVry announced that it had received a request for information from the U.S. Senate Committee on Health, Education, Labor and Pensions relating to the Committee's ongoing hearings relating to private-sector colleges receiving Title IV financial aid. Specifically, the request sought information to more accurately understand how DeVry's institutions use Federal resources, including how they recruit and enroll students, set program price or tuition, determine financial aid including private or institutional loans, track attendance, handle withdrawal of students and return of Title IV dollars and manage compliance with the requirement that no more than 90% of revenues come from Title IV dollars. In addition, the request also sought information concerning the number of students who complete or graduate from programs offered by DeVry's institutions, how many of those students find new work in their educational area, the debt levels of students enrolling and completing programs and how DeVry tracks and manages the number of students who risk default within the cohort default rate window.

68.    As a result, DeVry stock declined $3.13, or 6.14%, from a closing price of $50.96 on August 5, 2010, to a closing price of $47.83 on August 6, 2010, on a 108% increase in trading volume.

69.    On August 12, 2010, DeVry issued a press release reporting financial results for its fiscal 2010 fourth quarter and full year ended June 30, 2010. The Company reported net income of $71.6 million or $0.99 diluted earnings per share and revenue of $506.7 million, for the quarter. The Company reported net income of $279 million or $3.87 diluted earnings per share and revenue of $1,915 million for the year.

70.    Thereafter, DeVry stock declined $0.48 or 1.05% from a closing price of $45.79 on August 11, 2010, to a closing price of $45.31 on August 12, 2010. On August 13, 2010, DeVry stock declined another $2.60, or 5.74%, to a closing price of $42.71. Although defendants were reporting seemingly positive financial results, as news continued to come out concerning details of the government's investigation and the anticipated repercussions from the investigation on DeVry's business and prospects, DeVry stock continued to decline. But for defendants' false and misleading statements, the stock would have declined even further.

**THE TRUTH IS REVEALED**

71.    On August 13, 2010, after the market closed, the U.S. Department of Education released data on student-loan repayment rates at the nation's colleges and universities. The data showed that the repayment rates were 54% at public colleges and universities, 56% at private nonprofit institutions and 36% at for-profit colleges. The data showed that the repayment rates at DeVry's schools were just 38%.

72.    In addition, the U.S. Department of Education proposed new regulations for programs to continue to be eligible to receive federal financial aid. The tests for eligibility would be based on repayment rates and debt-to-income loads. Under the proposed "gainful employment" regulations,

programs would need to have a repayment rate of at least 45% to continue to be eligible for federal financial aid. The regulations if adopted will go into effect in July 2011. Based on the proposed regulations, many of DeVry's programs are in jeopardy of losing their financial aid status.

73. On this news, the price of DeVry's stock decreased an additional $3.74, or 8.76%, from a closing price of $42.71 on August 13, 2010, to a closing price of $38.97 on August 16, 2010, the next trading day, on a 234% increase in trading volume.

74. The true facts, which were known by the defendants but concealed from the investing public during the Class Period, were as follows:

(a) the Company failed to disclose that it had engaged in improper and deceptive recruiting and financial aid lending practices and, due to the government's scrutiny into the for-profit sector, the Company would be unable to continue these practices in the future;

(b) the Company failed to maintain proper internal controls;

(c) many of the Company's programs were in jeopardy of losing their eligibility for federal financial aid; and

(d) as a result of the foregoing, defendants' statements regarding the Company's financial performance and expected earnings were false and misleading and lacked a reasonable basis when made.

75. As a result of defendants' false statements and omissions, DeVry common stock traded at artificially inflated prices during the Class Period. After the above revelations seeped into the market, however, the Company's shares were hammered by massive sales, sending them down approximately 46% from their Class Period high.

## ADDITIONAL SCIENTER ALLEGATIONS

76. As alleged herein, defendants acted with scienter in that defendants knew that the public documents and statements issued or disseminated in the name of the Company were

18

materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws. As set forth elsewhere herein in detail, defendants, by virtue of their receipt of information reflecting the true facts regarding DeVry, their control over, and/or receipt and/or modification of DeVry allegedly materially misleading misstatements and/or their associations with the Company which made them privy to confidential proprietary information concerning DeVry, participated in the fraudulent scheme alleged herein.

## LOSS CAUSATION/ECONOMIC LOSS

77.     During the Class Period, as detailed herein, the defendants made false and misleading statements and engaged in a scheme to deceive the market and a course of conduct that artificially inflated the price of DeVry common stock and operated as a fraud or deceit on Class Period purchasers of DeVry stock by misrepresenting the Company's business and prospects. Later, when the defendants' prior misrepresentations and fraudulent conduct became apparent to the market, through a series of partial disclosures, the price of DeVry stock fell precipitously, as the prior artificial inflation came out of the price over time. As a result of their purchases of DeVry common stock during the Class Period, plaintiff and other members of the Class suffered economic loss, *i.e.*, damages, under the federal securities laws when the above-described revelations reached the market and the artificial inflation was removed.

## NO SAFE HARBOR

78.     DeVry's verbal "Safe Harbor" warnings accompanying its oral forward-looking statements ("FLS") issued during the Class Period were ineffective to shield those statements from liability.

79.     The defendants are also liable for any false or misleading FLS pleaded because, at the time each FLS was made, the speaker knew the FLS was false or misleading and the FLS was authorized and/or approved by an executive officer of DeVry who knew that the FLS was false. None of the historic or present tense statements made by defendants were assumptions underlying or relating to any plan, projection or statement of future economic performance, as they were not stated to be such assumptions underlying or relating to any projection or statement of future economic performance when made, nor were any of the projections or forecasts made by defendants expressly related to or stated to be dependent on those historic or present tense statements when made.

## COUNT I

### For Violation of §10(B) of The 1934 Act And Rule 10b-5
### Against All Defendants

80.     Plaintiff incorporates ¶¶1-79 by reference.

81.     During the Class Period, defendants disseminated or approved the false statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

82.     Defendants violated §10(b) of the 1934 Act and Rule 10b-5 in that they:

(a)     employed devices, schemes and artifices to defraud;

(b)     made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

(c)     engaged in acts, practices and a course of business that operated as a fraud or deceit upon plaintiff and others similarly situated in connection with their purchases of DeVry common stock during the Class Period.

83. Plaintiff and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for DeVry common stock and sustained substantial losses when the artificial inflation was removed as a results of the disclosures described herein. Plaintiff and the Class would not have purchased DeVry common stock at the prices they paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated by defendants' misleading statements.

## COUNT II

### For Violation of §20(A) of The 1934 Act
### Against All Defendants

84. Plaintiff incorporates ¶¶1-79 by reference.

85. The Individual Defendants acted as controlling persons of DeVry within the meaning of §20(a) of the 1934 Act. By reason of their positions with the Company, and their ownership of DeVry common stock, the Individual Defendants had the power and authority to cause DeVry to engage in the wrongful conduct complained of herein. DeVry controlled the Individual Defendants and all of its employees. By reason of such conduct, defendants are liable pursuant to §20(a) of the 1934 Act.

## PRAYER FOR RELIEF

WHEREFORE, plaintiff prays for judgment as follows:

A. Declaring this action to be a proper class action pursuant to Fed. R. Civ. P. 23;

B. Awarding plaintiff and the members of the Class damages, including interest;

C. Awarding plaintiff reasonable costs and attorneys' fees; and

D. Awarding such equitable/injunctive or other relief as the Court may deem just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury.

DATED:  November 1, 2010               WEXLER WALLACE LLP


                                        /s/   Kenneth A. Wexler
                                      KENNETH A. WEXLER
                                      Kenneth A. Wexler
                                      Edward A. Wallace
                                      Kara A. Elgersma
                                      55 W. Monroe Street, Suite 3300
                                      Chicago, IL  60603
                                      Telephone 312/346-2222
                                      312/346-0022 (fax)
                                      kaw@wexlerwallace.com
                                      eaw@wexlerwallace.com
                                      kae@wexlerwallace.com

                                      ROBBINS GELLER RUDMAN
                                        & DOWD LLP
                                      David J. George
                                      Paul J. Geller
                                      Robert J. Robbins
                                      120 E. Palmetto Park Road, Suite 500
                                      Boca Raton, FL  33432
                                      Telephone:  561/750-3000
                                      561/750-3364 (fax)
                                      dgeorge@rgrdlaw.com
                                      pgeller@rgrdlaw.com
                                      rrrobbins@rgrdlaw.com

                                      SUGARMAN & SUSSKIND
                                      Robert A. Sugarman
                                      Pedro A. Herrera
                                      100 Miracle mile   #300
                                      CORAL GABLES, FL 33134
                                      Telephone:  305/529-2801 - Main
                                      305/447-8115 (fax)
                                      PHerrera@sugarmansusskind.com
                                      Sugarman@sugarmansusskind.com

                                      *Attorneys for Plaintiff*