10-7031.121-RSK                                                March 27, 2012

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

|  |  |  |
|---|---|---|
| BOCA RATON FIREFIGHTERS' AND POLICE PENSION FUND, individually and on behalf of all others similarly situated, | ) ) ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | No. 10 C 7031 |
| DEVRY INC., DANIEL HAMBURGER, and RICHARD M. GUNST, | ) ) ) | |
| Defendants. | ) ) | |

### MEMORANDUM OPINION

Before the court is the motion to dismiss of defendants DeVry, Inc. ("DeVry"), Daniel Hamburger, and Richard M. Gunst. For the reasons explained below, we grant the defendants' motion.

### BACKGROUND

Illinois-based DeVry owns and operates for-profit undergraduate and graduate schools. (Consolidated Class Action Compl. (hereinafter, "Compl.") ¶ 22.)[1] Daniel Hamburger is DeVry's president and CEO; Richard Gunst is its CFO and treasurer. (Id. at ¶¶ 24-25.) Plaintiff Boca Raton Firefighters' and Police Pension Fund ("the Fund") purchased DeVry common stock during the putative class period, October 25, 2007 through August 13, 2010. (Id. at ¶¶

---

[1] Although styled a "consolidated" complaint, this case has not been consolidated with any other action.

- 2 -

1, 21; see also Cert. of Named Pl., attached as Ex. 1 to Pl.'s Original Compl.)  The Fund filed its original complaint on November 1, 2010, alleging in a conclusory fashion that the defendants had engaged in "abusive and fraudulent recruiting and financial aid lending practices."  (Original Compl. ¶ 7.)  We entered the parties' proposed scheduling order on November 18, 2010, which gave the Fund sixty days to file an amended complaint.  It appears that the Fund used that time to conduct an investigation that it should have conducted before filing this lawsuit.[2] The Fund now cites statements from 33 confidential witnesses ("CW's") to support its allegation that the defendants employed a "systematically predatory business model" to increase student enrollment.  (Compl. ¶ 3.)[3] According to the Fund, the defendants made numerous public statements during the class period about DeVry's business practices and financial performance that were inconsistent with the way that it actually conducted its business.  (Id. at ¶¶ 194-384.)  These misleading statements caused DeVry's stock to become "artificially inflated," until a series of newspaper articles and government-agency reports disclosed the "truth" about the company, causing its stock price to fall.  (Id. at ¶¶ 357, 361-62, 364-65, 370, 372-73,

---

[2]  At the hearing on the parties' proposed scheduling order, the Fund effectively conceded that it had not even tried to comply with the heightened pleading standard governing this putative securities class action.  (See Trans. of Proceedings, dated Jan. 5, 2011, at 6); see also Private Securities Litigation Act of 1995 ("PSLRA"), 15 U.S.C.A. § 78u-4.

[3]  The Fund also dropped David Pauldine, a senior DeVry executive, as a defendant.

- 3 -

385-87.) The Fund's two-count complaint alleges that the defendants violated Rule 10b-5 (Count I), and separately asserts control-person liability against Hamburger and Gunst (Count II). The defendants have moved to dismiss the complaint in its entirety.

## A.    Standard of Review

To prevail on its Rule 10b-5 claim, the Fund must establish the following: "(1) the defendant made a false statement or omission (2) of material fact (3) with scienter (4) in connection with the purchase or sale of securities (5) upon which the plaintiff justifiably relied and (6) that the false statement proximately caused the plaintiff damages." Makor Issues & Rights, Ltd. v. Tellabs, Inc., 437 F.3d 588, 595 (7th Cir. 2006) (rev'd on other grounds by Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308 (2007)) (hereinafter, "Tellabs I"). The defendants argue that the Fund has not adequately alleged facts supporting elements (1), (2), (3), and (6). (See Defs.' Mem. at 15-16.) Because this is a putative securities class action, the first three elements are subject to the PSLRA's "[e]xacting pleading requirements." Tellabs, 551 U.S. at 313; see 15 U.S.C. § 78u-4(a)(1). We discuss those requirements in greater detail below. The parties agree (see Pl.'s Resp. at 41-42, Defs.' Reply at 26) that this heightened pleading standard does not apply to the Fund's proximate cause (so-called "loss causation") allegations. See, e.g., Ong ex rel. Ong v. Sears, Roebuck & Co., 459 F.Supp.2d 729, 742-43 (N.D. Ill. 2006)

- 4 -

(concluding that loss-causation allegations are governed by Fed. R. Civ. P. 8(a)(2)) (collecting cases).  When assessing the Fund's complaint we "must, as with any motion to dismiss for failure to plead a claim on which relief can be granted, accept all factual allegations in the complaint as true." <u>Tellabs</u>, 551 U.S. at 322.

**B.    The Defendants' Class-Period Statements[4]**

The Fund, in citing nearly 50 allegedly false or misleading statements, "mistakes quantity for quality." <u>Metzler Inv. GMBH v. Corinthian Colleges, Inc.</u>, 540 F.3d 1049, 1070 (9th Cir. 2006).  So far as we can tell from the complaint, DeVry actually experienced the increased enrollment and revenues that it reported to investors during the class period.  (<u>See</u> Compl. ¶¶ 194, 200, 207, 215, 220, 227, 232, 238, 244, 249, 257, 264, 271, 279, 287, 292, 295, 311, 320, 329, 342, 350, 375, and 380.)  These statements would still be true even if the Fund adequately alleged and proved widespread student-recruiting abuses by the company.  <u>See In re Advanta Corp. Securities Litigation</u>, 180 F.3d 525, 538 (3d Cir. 1999) (*abrogated on other grounds by* <u>Tellabs</u>, 551 U.S. at 325 *as recognized in* <u>Institutional Investors Group v. Avaya, Inc.</u>, 564 F.3d 242, 277 (3d Cir. 2009)) ("Factual recitations of past earnings, so long as they

---

[4]/   We reject the defendants' invitation to summarily dismiss the complaint as improper "puzzle pleading." (<u>See</u> Defs.' Mem. at 16-17.)  The complaint's format — setting forth the alleged scheme in one section and the defendants' alleged misstatements and omissions in another — creates repetition.  But not, we think, to the point where the complaint is too difficult to understand.  As we are about to discuss, the complaint's problems are substantive, not structural.

- 5 -

are accurate, do not create liability under Section 10(b)."); see also FindWhat Investor Group v. FindWhat.com, 658 F.3d 1282, 1306 (11th Cir. 2011) ("No reasonable investor would believe that a conclusory, but apparently accurate, report of company-wide revenue growth naturally implied that all was well within every component of the company that could possibly affect revenue in the future."). The Ninth Circuit's opinion in Metzler, which also involved a for-profit school, is persuasive and on point.  In that case, the plaintiffs alleged that the defendant's financial disclosures misled investors to believe that the company had complied with regulations governing for-profit schools. See Metzler, 540 F.3d at 1070. The Metzler court concluded that this general allegation, which the plaintiffs used to impugn "virtually every statement made by [the defendant] during the Class Period related to the company's financial health or performance," was too vague to satisfy the PSLRA.  Id. at 1070.  The Fund makes essentially the same allegation throughout its complaint about DeVry's historical revenues and enrollment figures.  (See Compl. ¶¶ 200, 207, 215, 220, 227, 232, 238, 244, 249, 257, 264, 271, 279, 287, 292, 295, 311, 320, 329, 342, 350, 375, and 380.)

However, the Fund does cite potentially actionable statements concerning: (1) student recruiting and enrollment practices (see, e.g., Compl. ¶¶ 339, 367 (indicating that the company accurately disclosed program costs and financial-aid obligations to students);

- 6 -

(2) the company's recruiter-compensation policies (see, e.g., id. ¶ 291 ("[O]ur recruiter compensation system has been and continues to be fully compliant"); and (3) graduate employment statistics (see, e.g., id. at ¶ 211 ("The most recent three terms, 92.6% of our graduates obtained employment in their field of study within six months of graduation at an average starting salary of $42,805"). See, e.g., Lapin v. Goldman Sachs Group, Inc., 506 F.Supp.2d 221, 240 (S.D.N.Y. 2009) (the defendant's statements about its "unbiased" and "independent" securities analysts created a duty to disclose conflicts of interest). In addition, we will assume for purposes of this motion that the defendants' statements about the reasons for its success are actionable. (See, e.g., Compl. ¶ 281 (attributing the company's success to legitimate business factors other than its "predatory" practices).)[5]

## C.   Whether Plaintiffs Have Sufficiently Pled That the Defendants' Class-Period Statements Were Materially False

The Fund's complaint must "specify each statement alleged to have been misleading, the reason or reasons why the statement is

---

[5]   See Freudenberg v. E*Trade Financial Corp., 712 F.Supp.2d 171, 180 (S.D.N.Y. 2010) (A defendant may have a duty to disclose wrongdoing if it "puts the topic of the cause of its financial success at issue.") (citation and internal quotation marks omitted); see also Steiner v. MedQuist Inc., Civil No. 04-5487 (JBS), 2006 WL 2827740, *14-16 (D.N.J. Sept. 29, 2006) ("[I]n a number of public filings reporting revenue, MedQuist failed to disclose its billing scheme, instead attributing its revenues to legitimate business factors such as 'increased sales to existing customers, sales to new customers and additional revenue from acquisitions.'"); but see In re Citigroup, Inc. Securities Litigation, 330 F.Supp.2d 367, 377 (S.D.N.Y. 2004) ("Plaintiff's allegation that Citigroup's failure to disclose that its revenues were derived from 'unsustainable and illegitimate sources' violated section 10(b) is likewise unavailing, for the federal securities laws do not require a company to accuse itself of wrongdoing.").

- 7 -

misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed." 15 U.S.C. § 78u-4(b)(1). This "particularity" requirement applies to allegations outside the plaintiff's personal knowledge, including allegations based upon counsel's interviews with confidential witnesses. See Taubenfeld v. Career Educ. Corp., No. 03 C 8884, 2005 WL 350339, *8 (N.D. Ill. Feb. 11, 2005). Applying this standard, we ask "whether the facts alleged are sufficient to support a reasonable belief as to the misleading nature of the statement or omission." Tellabs I, 437 F.3d at 595 (citation and internal quotation marks omitted).

The Fund identifies 33 confidential witnesses as the primary source for its allegations.[6] (See Compl. ¶¶ 39-72.) The Fund can satisfy the PSLRA's particularity requirement without disclosing the identity of these witnesses, but it must "describe [its] sources with sufficient detail to support the probability that a

---

[6]  The Fund has also attached to its complaint portions of two PowerPoint presentations. (See "Atlanta Metro Review 2006," attached as Ex. A to the Compl. (presentation purportedly showing pressure on student advisors to increase enrollment); "Georgia Metro GSP Conference Call," dated September 11, 2008, attached as Ex. B to the Compl. (purporting to show that some graduates were having difficulty finding employment).) Exhibit A was apparently created before the class period, and Exhibit B does not appear to support the proposition the Fund cites it for. Under the heading "Challenges," the document states that "[e]mployers looking for more experience than recent graduates can offer." (Ex. B at 2.) The Fund contends that this document supports its allegation that Pauldine (the senior DeVry executive) knew that admissions advisors were downplaying the qualifications for obtaining a criminal justice degree, even though DeVry's course catalog stated that students needed one year of law enforcement experience to enroll. (Compl. ¶ 135.) The document does not mention DeVry's criminal-justice program, and even if it did, there is no indication that Pauldine reviewed this document or attended the conference call.

- 8 -

person in the position occupied by the source would possess the information alleged, or in the alternative provide other evidence to support [its] allegations." Tellabs I, 437 F.3d at 596 (citation and internal quotation marks omitted). The complaint largely satisfies this requirement, providing details about where, when, and in what capacity the confidential witnesses worked while employed by DeVry. (See Compl. ¶¶ 39-72.) But we agree with the defendants that the complaint is often vague — perhaps strategically so — about the source for particular allegations. Paragraph 133 is typical:

> The Career Services department at DeVry's Federal Way, Washington campus was required to report that 85 percent of graduates were successfully placed in a job in their field of study within six months of graduation. In reality, the Federal Way campus job placement rate was around 50%. In order to keep DeVry's employment statistics artificially inflated, DeVry's Pleasant Hill campus listed students as participating in externships when those students already should have graduated. Indeed, the Pleasant Hill campus reported students with 500 hours of externships when most externships were 45 hours to 150 hours in length, and those students were listed as still participating in externships 200 days after they should have graduated. Prospective DeVry students could not know that DeVry was manipulating its employment statistics, and, according to CW 20, DeVry counted on the fact that prospective students would not ask questions about job placement or average salaries within their field, but instead take the information provided by DeVry at face value.

(Compl. ¶ 133.) Presumably the Fund does not have first-hand knowledge about the graduate-employment reporting policies at DeVry's Federal Way and Pleasant Hill campuses. So who or what is the source of this allegation? One might infer from the

allegations's context that the Fund is paraphrasing something CW 20 said, but CW 20 worked as a "Student Financial Advisor" in a call center in Wood Dale, Illinois.  (Id. at ¶ 59.)  Here is another example:

> The Company provided employees with a list ranking each employee's performance every Friday afternoon via email. According to CW 2, it was very much a competition: "it was all about beating people." She/he recalled that the list would "call out" the star performers and that the Company was very big on referring to the best performers as "stars." In violation of HEA [Higher Education Act], DeVry provided its "star" advisors with additional types of compensation for hitting or exceeding their quotas. These included expensive dinners, cash gifts, and days off from work. Perhaps the most extravagant reward was an invitation to an all-expense paid trip held over a long weekend for employees who consistently met or exceeded their numbers. The invitation only event was called the Pride Retreat and included an awards ceremony for the Company's top salespeople. Every employee invited to Pride (approximately 400-500 in any given year) was allowed to bring a guest and got free airfare, lodging at a fancy hotel, and a per diem. Recent locations for the yearly Pride Retreat included Las Vegas, Boca Raton, Florida and Puerto Rico.

(Id. at ¶ 170.)  Our best guess is that CW 2 is the source for the information in the first sentence, and it stands to reason that he/she would know that information.  (See id. at ¶ 41.)  But is CW 2 the source for the alleged HEA violations described in the rest of the paragraph?  We agree with the Fund that the PSLRA does not require it to identify a source for every allegation in the complaint, insofar as one or more deficient allegations will not doom the complaint if it is otherwise sufficient.  But its claims stand or fall based upon the allegations that comply with the PSLRA.  Cf. In re Career Educ. Corp., No. 03 C 8884, 2007 WL

- 10 -

1029092, *3 (N.D. Ill. Mar. 29, 2007) ("CEC II") ("[T]he court
cannot draw any inferences from allegations that are not themselves
well pleaded; zero plus zero is zero.").[7]

With respect to those allegations that are clearly attributed
to a confidential witness or another source, there are two general
problems: (1) vagueness; and (2) an apparent lack of company-wide
knowledge.[8]  General and/or vague allegations about the company's
practices are insufficient because we cannot adequately assess
their reliability. See Taubenfeld, 2005 WL 350339, *12 ("Plaintiff
. . . relies on vague verbiage, such as 'many of the accounts,' or
simply 'students' or 'accounts.'").  Even concrete allegations of
wrongdoing may be deficient if they do not allege a problem of
sufficient magnitude to undermine the defendants' public statements
about DeVry's policies and practices. See In re Career Educ. Corp.
Securities Litigation, No. 03 C 8884, 2006 WL 999988, *5 n.4 (N.D.
Ill. Mar. 28, 2006) ("CEC I") (concluding that anecdotal
allegations concerning three unqualified students established, at
most, that those particular students were admitted, not that the

---

[7] As the parties point out, the CEC II court's orders dismissing the case
with prejudice and entering judgment in the defendants' favor were later vacated
pursuant to the parties' settlement agreement. (See Prelim. Approval Order,
attached as Ex. 1 to Defs.' Unopposed Second Mot. to Submit Add'l Auth. at Ex.
1, at ¶ 23.)  Nevertheless, the court's reasoning remains persuasive.

[8] The Fund accuses the defendants of exceeding the page limitations that
we imposed by attaching a chart summarizing their objections to each of the
confidential witness statements in the complaint.  We denied the Fund's motion
to strike the chart, but indicated that we would give it an opportunity to
respond to the chart if we relied on it in reaching our decision.  We agree with
the Fund that "the chart does not offer anything substantive beyond the argument
already raised in the" defendants' memorandum.  (Pl.'s Resp. at 20 n.6.)
Therefore, no further response is necessary.

- 11 -

defendants' general statements about the company were false); see also Order, Karam v. Corinthian Colleges, Inc., CV 10-6523-GHK, at 7 (C.D. Cal. Jan. 30, 2012) ("Logic dictates that the alleged improper practices would have to be widespread to render false any statement attributing the company's growth to legitimate business practices.").[9] We agree with the Fund that serious and/or pervasive illegal conduct is material, see, e.g., Roeder v. Alpha Industries, Inc., 814 F.2d 22, 24-26 (1st Cir. 1987) (concluding that allegations that the defendant's president and vice-president paid bribes to obtain a government contract were material), and would contradict one or more of the defendants' class-period statements. (See, e.g., Compl. ¶ 400 (From DeVry's Code of Business Conduct and Ethics: "[w]e strive to achieve the highest business and personal standards of conduct, as well as full compliance with the laws and regulation that apply to our business.").) The question is whether it has adequately alleged such conduct with the particularity that the PSLRA requires.

**(1) DeVry's "Sales"-Driven Corporate Culture**

The Fund's pejorative descriptions of DeVry's "sales"-driven culture are insufficient to support a Rule 10b-5 claim. It could not have come as a surprise to investors (including the Fund) that DeVry, a for-profit corporation, wanted to make as many "sales" as possible. (See, e.g., Compl. ¶¶ 96-98, 102-113, 116.) The fact

---

[9] A copy of the Karam court's order is attached as Exhibit A to the defendants' motion for leave to file additional authority (DKT #64).

- 12 -

that the Fund — for purposes of this litigation, anyway — believes that this culture is distasteful is not a basis for finding a Rule 10b-5 violation.  <u>See</u> <u>Roeder</u>, 814 F.2d at 26 ("Management cannot be expected to disclose information that some may find distasteful but that does not alter 'the "total mix" of information made available' to the investor.") (quoting <u>TSC Indus., Inc. v. Northway, Inc.</u>, 426 U.S. 438, 449 (1976)).  DeVry is not required to "direct conclusory accusations at itself or to characterize its behavior in a pejorative manner."  <u>Ballan v. Wilfred American Educational Corp.</u>, 720 F.Supp. 241, 249 (S.D.N.Y. 1989).  It would be "silly" and "unworkable" (<u>id.</u> (internal quotation marks omitted)) to require DeVry to tell investors that "its bottom-line is not the education of its students but the generation of monies to bloat its coffers." (Compl. ¶ 95; <u>see also</u> <u>id.</u> at ¶ 401 ("Contrary to statements made by the Defendants during the Class Period, neither DeVry nor its management were acting ethically or with integrity.").)

As for DeVry's alleged sales tactics, the Fund does not provide sufficient legal or factual context to assess its allegations.  It purports to quote (without providing a citation) accreditation standards requiring DeVry to convey accurate information to prospective students and prohibiting it from applying "undue pressure" during the recruiting process.  (<u>Id.</u> at ¶ 94.)  It then describes certain "high pressure" sales tactics. (<u>See</u> Compl. ¶¶ 118 ("Profile Interest Evaluations"); 120 (the

Socratic Method); 121 ("spin-selling"); 122 ("second-voicing").)
It is unclear whether any of these alleged tactics, short of
outright deception, ran afoul of accreditation standards. The Fund
does not allege, for instance, that any DeVry school actually lost
accreditation during the lengthy class period.

**(2) Deceptive Enrollment Practices**

The Fund asks us to infer that DeVry employees improperly
padded the company's enrollment figures by: (1) taking entrance
exams for prospective students; (2) forging application
information; and (3) enrolling students with low chances for
success. Some of the witness statements supporting these
allegations are vague. (See Compl. ¶¶ 113 (CW 10 states that "a
lot of advisors" would take the entrance exam for prospective
students); 114 (CW 16 states that he is aware of "several
instances" where advisors forged student signatures to finalize
incomplete applications); id. (CW 18 states that "at least one or
two [advisors] forged documents at least once every eight
weeks.").) Others are more concrete, but do not support an
inference of wide-spread fraud. (See, e.g., Compl. ¶ 173 ("CW 14
had a call with one woman who literally could not turn on a
computer, let alone figure out how to register and attend online
courses."); ¶ 174 (CW 22 recalling two incidents involving homeless
DeVry students); ¶ 175 (CW 15 recounting an incident involving a
schizophrenic student, and another involving a student suffering

- 14 -

from a "learning disability and paranoia").)  We accept as true the Fund's allegations that these specific incidents occurred.  See <u>CEC I</u>, 2006 WL 999988, *5.  But they do not support a reasonable belief that the defendants' class-period statements were false.  <u>Id.</u>

The Fund also alleges that DeVry employees misled students about financial-aid obligations and tuition.  Again, some of these statements are vague,[10] or based on second-hand information.[11]  CW 1 states more concretely that admissions advisers misled students about the time it would take to obtain their degrees.  (<u>Id.</u> at ¶ 150.)  According to the complaint, DeVry told students that they could obtain a business degree in two years and eight months for $68,000.  (<u>Id.</u>)  In order to graduate in this amount of time, students were required to take on "a full course-load of 12 or more credit hours per term."  (<u>Id.</u>)  The complaint then states that "federal financial aid benefits usually only covered six to nine credits per term."  (<u>Id.</u>)  This allegation is vague ("usually") and there is no citation to any rule or regulation limiting student aid in this fashion.  As far as we can tell from the complaint, a student might obtain the federal aid necessary to cover the extra

---

[10]  (<u>See</u> Compl. ¶ 138 ("According to CW 14, advisors frequently gave students incorrect or misleading information about financial aid, but the Company never investigated student complaints or held advisors accountable.").)

[11]  (<u>See</u> Compl. ¶ 138 ("According to CW 20, one of the most common complaints that students made about financial aid was 'my advisor told me that this was free money, I didn't realize it was a loan I had to pay back someday.'").)  The complaint's general allegations that students did not, or (more dubiously) could not, understand their loan obligations likewise fail to support a reasonable belief that the defendants' class-period statements were misleading.  (Compl. ¶¶ 139-40.)

- 15 -

three credits to graduate on an accelerated schedule.[12]  The Fund alleges only one instance where a student was "prevented" from graduating within three years, in that case because the student (CW 27) was working full-time.  (Id. at ¶ 152; see also id. (alleging that some unidentified person "promised" CW 27 that he/she could take 12 credits per term).)  In the same section of the complaint, the Fund alleges that CW 30's academic adviser told him/her that he/she had enough credits to graduate, only to learn later that he/she needed another class.  (See Compl. ¶ 159.)  In a similar vein, CW 26 "was told" (the complaint does not say by whom) that his/her out-of-pocket expenses would be $1,200, payable in two $600 installments.  (Id. at ¶ 144.)  But "the Company" later told CW 26 that he/she had to pay $600 *per month*.  (Id.)  The defendants state, without contradiction, that DeVry operates more than 90 campuses.  (See Defs.' Mem. at 6 (citing DeVry's 2010 Form 10-K); see also Compl. ¶ 22 (DeVry is "one of the largest for-profit schools.").)  The loosely connected experiences of a few students do not undermine the defendants' class-period statements.  (See, e.g., id. at ¶ 339 (Hamburger: students "should definitely have access to" information about costs, debt, and average salaries).)

---

[12]/  The complaint also alleges that "most" students took six years to obtain their degrees.  (Id. at ¶ 151.)  But the Fund does not allege that DeVry employees told prospective students that most students graduated sooner. Instead, it alleges that "the scripts provided no information about how unlikely and difficult it was" to graduate within three years.  (Id.)  It is not misleading to fail to mention the obvious possibility that students may not graduate on an accelerated schedule.

- 16 -

**(3)  Recruiter Compensation**

The Fund's recruiter-compensation allegations are stronger, but still deficient.  The HEA prohibits schools from providing "any commission, bonus, or other incentive payment based directly or indirectly on success in securing enrollments or financial aid to any persons or entities engaged in any student recruiting or admission activities or in making decisions regarding the award of student financial assistance."  20 U.S.C.A. § 1094 (20); <u>see also</u> 34 C.F.R. § 668.14(b)(22)(i).  However, the regulation that was in effect for most of the class period permitted:

> [t]he payment of **fixed compensation**, such as a fixed annual salary or a fixed hourly wage, as long as that compensation is not adjusted up or down more than twice during any twelve month period, and any adjustment is not based **solely** on the number of students recruited, admitted, enrolled, or awarded financial aid. For this purpose, an increase in fixed compensation resulting from a cost of living increase that is paid to all or substantially all full-time employees is not considered an adjustment.

34 C.F.R. § 668.14(b)(22)(ii)(A) (emphasis added).  The complaint alleges that DeVry's admissions and financial advisors were evaluated "at least twice a year."  (Compl. ¶ 166.)  The company purported to grade those employees based on enrollment performance (60%) and non-enrollment factors such as "behavior and timeliness" (40%).  (<u>Id.</u> at ¶ 167.)  Instead, the Fund alleges that compensation "was solely based on an advisor's sales numbers."  (<u>Id.</u>; <u>see also</u> <u>id.</u> at ¶ 168 (CW 1 stating that the "behavioral" component of

- 17 -

employee evaluations was pretextual).)  Some of the confidential witness statements supporting this allegation are conclusory,[13] as is the Fund's assertion that CW 23's compensation was based solely on defendants' "illegal incentive compensation policy." (Id. at ¶ 171.)  CW 9, on the other hand, specifically alleges that he/she received between 40% and 60% of his/her compensation as a "variable bonus" tied to enrollment. (Id. at ¶ 169.)  CW 9 also received a salary, but "that could only increase by a few percentage points each year." (Id.)  This allegation, if proven, would establish an HEA violation.  And unlike some of the Fund's other allegations, we think it is reasonable to extrapolate DeVry's compensation policy from the experiences of "front line" employees.[14]  But we are reluctant to permit a securities class action to proceed based on statements from a single anonymous employee.  In Higginbotham v. Baxter Int'l Inc., 495 F.3d 753, 757 (7th Cir. 2007), our Court of Appeals indicated that allegations from confidential witnesses should be "steep[ly]" discounted.  The Court seemed generally less skeptical of such allegations in Makor Issues & Rights, Ltd. v. Tellabs Inc., 513 F.3d 702, 711-12 (7th Cir. 2008) (hereinafter, "Tellabs II"), decided a year after Higginbotham.  But there, "[t]he information that the confidential informants are reported to have

---

[13]  (See Compl. ¶ 168 (CW 4: "[i]t was completely numbers;" CW 5: "if you are successful at admissions, it was really a numbers game.").)

[14]  The defendants' confident public statements that DeVry complied with recruiter-compensation laws supports the view that the company's recruiters were all subject to the same policy.

- 18 -

obtained [was] set forth in convincing detail, with some of the information, moreover, corroborated by multiple sources." Id. at 712; see also In re Cabletron Systems, Inc., 311 F.3d 11, 29-30 (1st Cir. 2002) (courts should evaluate confidential-witness allegations taking into account such factors as "the level of detail provided by the confidential sources, the corroborative nature of the other facts alleged (including from other sources), the coherence and plausibility of the allegations, the number of sources, the reliability of the sources, and similar indicia.").[15]  The Fund alleges that eight confidential witnesses provided information concerning DeVry's compensation policy, (see Compl. ¶ 171), but only one witness provides information with the particularity that the PSLRA requires.

The Fund contends that its recruiter-compensation allegations are corroborated by other sources, citing a False Claims Act lawsuit challenging DeVry's recruiter-compensation practices and a related DOJ investigation. (See Compl. ¶¶ 239, 243, 291; Pl.'s Resp. at 9, 22, 40.)  As the defendants point out, the qui tam suit was filed by a DeVry employee who allegedly worked for the company between January 2002 and November 2003, long before the start of the class period in this case. See Schultz v. Devry Inc., No. 07 C 5425, 2009 WL 562286, *1 (N.D. Ill. Mar. 4, 2009).  And assuming that it is

---

[15]/  Both Higginbotham and Tellabs II addressed the scienter element of a Rule 10b-5 claim, rather than falsity, but we do not understand the Court's discussion of confidential witnesses to be limited to that element.

admissible, (cf. Fed. R. Evid. 408), the fact that DeVry settled the lawsuit on appeal of a dismissal in its favor is equivocal evidence at best, even taking into account the alleged size of the settlement ($4.9 million). (See Compl. ¶ 243.) The DOJ declined to intervene in the *qui tam* action after conducting its own investigation into DeVry's recruiter-compensation practices, apparently without any findings of wrongdoing. (See id. at ¶¶ 231, 243.) Although we consider it a close call, we conclude that the Fund has not alleged facts supporting a reasonable belief that the defendants' representations about its recruiter-compensation policies were false.

### (4) Graduate Employment Statistics

During the class period the defendants repeatedly emphasized that approximately 90% of DeVry graduates were employed in their field of study within six months after graduation and making on average $40,000 per year. (See, e.g., id. at ¶ 194; see also id. at ¶ 223 (Hamburger: "The DeVry University value proposition centers around what we call the 90/40, that is at least 90% of our graduates are employed in their field of study within six months at an average starting salary of $40,000."). Some of the Fund's allegations do not support the view that DeVry's job-placement statistics were misleading. For example, the complaint alleges (without attribution) that DeVry counted students as employed in their field of study if they retained a position they held prior to graduation.

(Id. at ¶ 132.)  And CW 21 indicates that DeVry counted graduates as employed in their field of study "even if [they] only held the job for one day."  (Id.)  But the defendants did not represent that the graduates included in these statistics: (1) were unemployed, or employed in other fields, at graduation; and (2) held the relevant position for any particular length of time.  Nor do we think it is implied.  See CEC II, 2007 WL 1029092, *6 ("Plaintiffs complain that CEC included placements that the student had achieved without CEC's assistance in its numbers, but do not explain why this made reported placement percentages false.").

The Fund is on firmer ground when it alleges that the phrase "employed in their field of study" is misleading.  CW 1 indicates that "if a student graduated with a computer networking degree, but was only able to find employment at Wal-Mart as a teller who sometimes used a computerized cash register, DeVry would claim that the student was employed within their field."  (Id. at ¶ 130; see also id. at ¶ 131 (CW 21: "DeVry would count students who graduated with IT-related degrees who found jobs as accountants as placed in their field of study if the graduates were working on general ledger entries;" CW 33: "two Health and Information Technology (HIT) graduates were employed in customer service jobs at a health-related company and were counted by DeVry as employed in their field").  But the Fund has not given us enough context to say whether DeVry's "creative" definition of "field of study" materially impacted the

statistics that DeVry reported to investors. See CEC I, 2006 WL 999988, *8 ("Plaintiff's burden . . . was to raise an inference of fraud on a nation-wide level such that CEC's statements and omissions regarding its starts, student population, and job placement numbers nationally were false or misleading."). CW 1 and CW 21 provide two hypothetical examples of the kinds of things DeVry "would" do to bolster its job-placement statistics. CW 33 provides a concrete example, but it only involves two graduates. These allegations are insufficient to support the inference that DeVry's job-placement statistics were materially false.

### (5) Eligibility Requirements for Federal Aid

If DeVry graduates exceed certain "cohort default rates"[16] on their student loans DeVry will become ineligible to receive further federal financial-aid monies. See 34 C.F.R. § 668.187 (a school will lose access to financial-aid funds if its most recent cohort default rate exceeds 40%, or its three most recent cohort default rates each exceed 25%). On September 10, 2010 — outside the class period — DeVry announced that its 2008 two-year cohort default rate exceeded 10%. (Compl. ¶ 390-91.) This caused a delay in federal-aid disbursements to students at DeVry University and Carrington College California, another DeVry school. (Id.; see also id. at ¶¶ 22, 89); 20 U.S.C. § 1078-7 (schools must delay disbursements to

---

[16]/ The "cohort default rate" is the percentage of borrowers who begin repaying student loans during a particular fiscal year and who default prior to the end of a specified period. See 34 CFR § 668.183.

first-year students for 30 days after the student begins school, but "exempt[ing]" schools with default rates below 10% for each of the previous three fiscal years). The Fund vaguely alleges that "advisors [who?] were instructed [by whom?] to tell students who inquired as to why there was a delay in receiving their funds that the disbursement rules were always that way, and to conceal that this was in fact a change due to DeVry's high default rate." (Id. at ¶ 391.) This allegation is untethered to any statement that the defendants made during the class period.[17] Indeed, the press release announcing DeVry's cohort default rates — which were still substantially below the maximum default rates for Title IV eligibility (25% for three consecutive years, or 40% in one year) — disclosed the fact that disbursements would be delayed. (Id. at ¶ 390.) The Fund does allege that DeVry's actual default rates were higher than reported (again, after the class period), but the allegation does not satisfy the PSLRA. CW 15, who "oversaw a team of eight to ten Student Finance Advisors," claims that the default rates she reported for his/her "portfolio of students" were not reflected in the "quarterly numbers that DeVry circulated." (Id. at ¶ 392.)[18] This allegation appears to be based on the fact that

---

[17] Indeed, we are not sure that it is even misleading: all schools must delay the first installment of loan proceeds to first-year students, unless they maintain default rates below 10%. See 20 U.S.C. § 1078-7.

[18] The phrase "quarterly numbers" appears to refer to default numbers that were reported quarterly to DeVry's Board of Directors, rather than to investors. (See Compl. ¶ 393 ("According to CW 15, the Title IV default numbers were reported quarterly to . . . Devry's Board of Directors.").)

CW 15 reported to his/her supervisor higher cohort default rates for *his/her students* than DeVry reported for all DeVry University students. (See id. at ¶ 392 ("For her/his portfolio of students, CW 15 calculated the two-year cohort default rate and provided the data to her/his director — 'I guarantee it was not 10.2 percent, it was 13 or 14 percent.'").) Even if CW 15's "portfolio of students" was representative — and the Fund has not provided enough context to determine whether it was — it is unclear what the alleged discrepancy signifies. As the defendants point out, the Department of Education ("DOE") calculates cohort-default rates, not the individual schools. See 34 C.F.R. § 668.183(a). And as we understand the regulations, the schools are not the source for the underlying data about the loans. See 34 CFR § 668.185 (indicating that the information is compiled by "data managers"); 34 CFR § 668.182(b) ("data manager" means the DOE, a guaranty agency, or a loan servicer, depending on the type of the loan).

The Fund also cites what is known as the "90/10" rule: a DeVry school will become ineligible to participate in Title IV programs if, for any two consecutive fiscal years, it derives more than 90% of its cash basis revenue, as defined in the rule, from Title IV programs. (Id. at ¶¶ 90-91.) But the Fund does not allege that any DeVry school violated the 90/10 rule during the class period, or that the company misrepresented the percentage of its revenues derived from Title IV programs. (Cf. id. at ¶ 12 ("During the Class

- 24 -

Period, DeVry derived between 70% and 77% of its revenue from Title

IV funding.").)  In sum, the complaint's properly-pled allegations

do not support the inference of widespread illegality that the Fund

asks us to draw.  Consequently, it has failed to adequately allege

that the defendants' class-period statements were false.

**D.    Whether the Fund Has Sufficiently Pled Scienter**

With an exception that does not apply here, the PSLRA provides,

> [I]n any private action arising under this chapter in
> which the plaintiff may recover money damages only on
> proof that the defendant acted with a particular state of
> mind, the complaint shall, with respect to each act or
> omission alleged to violate this chapter, state with
> particularity facts giving rise to a strong inference
> that the defendant acted with the required state of mind.

15 U.S.C.A. § 78u-4(b)(2)(A).  A complaint satisfies this standard

only "if a reasonable person would deem the inference of scienter

cogent and at least as compelling as any opposing inference one

could draw from the facts alleged." Tellabs, 551 U.S. at 324.  In

their opening brief, the defendants argued that a plaintiff cannot

satisfy this standard by alleging that the defendants "must have

known" the truth. (Defs.' Mem. at 38-39.)  But they failed to cite

and distinguish Tellabs II, which found a strong inference of

scienter premised on a similar theory.  In that case, the

plaintiffs alleged that the defendants (the corporate defendant and

its CEO) misled investors about the demand for their most important

products.  See Tellabs II, 513 F.3d at 706-07.  The Court

considered it "extremely unlikely" that the defendants would not

have known that their public statements were false, notwithstanding the apparent lack of any allegations directly establishing that the individual defendant (or any other senior executive) knew facts contradicting those statements. See id. at 711 ("Is it conceivable that [the individual defendant] was unaware of the problems of his company's two major products and merely repeating lies fed to him by other executives of the company? It is conceivable, yes, but it is exceedingly unlikely.").

That said, the fraud allegations in Tellabs II were much stronger than the allegations here. Even assuming that the Fund can amend its complaint to clear the first hurdle (material falsity), the fraud alleged — with the exception of the complaint's recruiter-compensation allegations — is diffuse. According to the complaint, DeVry's recruiters were generally too aggressive and sometimes resorted to deception to meet management's enrollment expectations. The fact that enrollments were vital to DeVry's business does not create a "strong inference" that the defendants knew whether or how often its recruiters crossed the line.[19] The Fund's other relevant allegations are weak. A handful of the Fund's confidential witnesses state that they had some interaction

_____

[19]/ The complaint refers to recruiting scripts, suggesting that DeVry's "abusive" practices were formal company policy. But with one exception, the complaint does not indicate what the scripts said. (See Compl. ¶ 151 ("The scripts that Admissions Advisors used with prospective students emphasized the ability to graduate in two years and eight months, but the scripts provided no information about how unlikely and difficult it was to do that.").) Even if the complaint had supplied more detail, there are no allegations indicating that senior management knew about the scripts' content.

- 26 -

with DeVry's senior management while they worked for the company. CW 19, who was the Dean of Academics at DeVry's Irving, Texas campus during the class period, "believes" that Hamburger and Pauldine (see supra n.3) met with school presidents "once per quarter." (Compl. ¶¶ 58, 98.) CW 32, a "Metro President" who "oversaw operations" at three DeVry campuses, describes monthly conference calls led by Pauldine in which participants discussed "corporate-level and/or system-wide issues, including enrollment, retention, career placement and financial aid." (Id. at ¶ 99.) CW 32 also describes a pre-class-period performance review conducted by Pauldine, Hamburger, and others. (Id. at ¶¶ 100-103.) These individuals told CW 32 that they were "very concerned" about enrollment numbers at the Federal Way Campus. (Id. at 102.) CW 32 states that he/she was effectively demoted for not meeting management's enrollment expectations. (Id. at 302.) The Fund also alleges, without specifically citing any source, that defendants monitored enrollment numbers "very carefully" through "Daily Activity Reports," which summarized the performance of DeVry's Admissions Advisors. (Id. at 104.) CW 22 "believed" that DeVry's Director of Career Services compiled graduate employment reports and distributed them to school presidents, and that Hamburger and Pauldine also reviewed them. (Id. at ¶ 136.)

The pressure that these witnesses describe to meet enrollment expectations or "sales quotas" is not inconsistent with the

defendant' public statements. See CEC II, 2007 WL 1029092, *5 ("Pressure to meet performance goals, no matter how tough or unreasonable it might have been, is not evidence that CEC employees engaged in misconduct or fraud in order to meet those goals."); see also Friedman v. Rayovac Corp., 295 F.Supp.2d 957, 995-96 (W.D. Wis. 2003) ("[P]ushing for more sales is hardly grounds for a fraud claim. It would be more surprising if officers did not put sales demands on their employees. Regardless, doing so does not create a strong inference of scienter."). Moreover, the recruiter-compensation regulation does not prohibit schools from firing or demoting employees who do not meet management's enrollment expectations. See United States v. Corinthinan Colleges, 655 F.3d 984, 992-93 (9th Cir. 2011). It merely prohibits certain forms of incentive compensation. Id. As for the enrollment figures themselves, there is no indication in the complaint that they would raise a red flag about how they were generated. Even assuming that the individual defendants read the "Daily Activity Reports" tracking the performance of DeVry's admissions advisors, (Compl. ¶ 104), the Fund does not explain how that data would reveal (for example) that some advisors were taking the entrance exam for prospective students. See Pugh v. Tribune Co., 521 F.3d 686, 694 (7th Cir. 2008) (distinguishing between the defendants' knowledge of a subsidiary's circulation figures and knowledge that the circulation figures were false); see also Higginbotham, 495 F.3d at

- 28 -

758 ("[T]here is a big difference between knowing about the reports from [the defendant's Brazilian subsidiary] and knowing that the reports are false."). Finally, even if the defendants' graduate-employment statistics were misleading (cf. supra Part C.(4).), the allegations that the defendants knew they were misleading are weak. CW 33, who held several "Career Services" positions at DeVry's Houston, Texas campus, states that the defendants "had to be monitoring the placement numbers because the numbers – placement, enrollment, and retention – were so important and were discussed at weekly local 'executive team' meetings (all Directors from the campus) and on conference calls and meetings with other Career Services directors (possibly monthly)." (Compl. ¶¶ 72, 99.) The Fund does not describe the contents of these meetings, and even if it had, it does not indicate how the individual defendants would know what was discussed. (See also Compl. ¶ 136 (CW 22 states that she made career-placement presentations to Hamburger and Pauldine "in the 2006-2007 timeframe and possibly in 2008," but does not describe the contents of those presentations).)

There are no allegations linking Hamburger, Gunst, or any other senior DeVry executive to facts contradicting the company's statements about its recruiter-compensation policies. But a case could be made for applying Tellabs II's reasoning to those statements: if DeVry paid recruiters "variable bonuses" tied to enrollment, is it likely that the defendants did not know that when

they *specifically* told investors otherwise? (See Compl. ¶ 377 (Hamburger: "[c]onsistent with current regulations, we don't pay commissions or bonuses based on enrollment."); see also id. at ¶¶ 286 (Hamburger: consistent with the safe-harbor provision, admissions advisors "have a base salary and their salary can be adjusted twice a year up or down"); 291 (Gunst: "our recruiter compensation system has been and continues to be fully compliant").) However, we have already held that the plaintiffs have not sufficiently alleged that those statements were false. (See supra Part C.(3).) Therefore, it is unnecessary to decide now whether the plaintiffs could plead scienter as to those alleged misrepresentations.

The Fund's motive allegations do little to bolster its deficient scienter allegations. The Fund alleges that Hamburger (but not Gunst) sold shares on four separate occasions during the class period. (Compl. ¶¶ 406-07.) "[B]ecause executives sell stock all the time, stock sales must generally be unusual or suspicious to constitute circumstantial evidence of scienter." Pugh, 521 F.3d at 695; see also Ronconi v. Larkin, 253 F.3d 423, 435 (9th Cir. 2001) ("[I]nsider trading is suspicious only when it is dramatically out of line with prior trading practices at times calculated to maximize the personal benefit from undisclosed inside information.") (citation and internal quotation marks omitted). The Fund argues that Hamburger's sales were suspicious because he

sold shares within days of making public statements about the company's performance, and because he did not sell any shares during the two years prior to the class period. However, Hamburger's stock sales did not correspond to major changes in the stock price, which undercuts the inference that the Fund is asking us to draw from the sales. The complaint alleges that on October 26, 2007, the second day of the class period, DeVry's stock rose 37.62% to $55.09. (Compl. ¶ 198.) Hamburger did not make his first alleged stock sale for another seven months, selling stock on April 25, 2008 at prices "between $55.44 per share and $57.46 per share." (Id. at ¶ 226.) He sold shares on three other occasions during the class period at comparable prices well below the class period high of $74.25 on April 10, 2010. (See id. at ¶¶ 263 (February 3, 2009: $57.50); 304 (October 15, 2009: $57.52), 319 (December 9, 2009 through December 14, 2009: between $57.50 and $57.78); see also id. at ¶ 10 (class period high).) Indeed, the last alleged sale occurred approximately four months before the stock price peaked and approximately six months before the truth allegedly began to leak into the market. (See id. at ¶¶ 319, 361); see also In re AFC Enterprises, Inc. Securities Litigation, 348 F.Supp.2d 1363, 1373-74 (N.D. Ga. 2004) (sales below the class-period high, and months before the truth reaches the market, are not suspicious); In re Party City Securities Litigation, 147 F.Supp.2d 282, 313 (D.N.J. 2001) (similar). Gunst, for his part,

- 31 -

actually increased his stock ownership during the class period
without making any corresponding sales. (See Defs.' Mem. at 41;
Pl.'s Resp. at 38.)   The Fund argues that the individual
defendants' stock purchases do not undercut the inference that they
were motivated to commit fraud because they exercised options to
purchase the additional stock at strike prices below market value.
(Pl.'s Resp. at 38.)   But it does not cite any authority for this
proposition, which in any event strikes us as dubious as applied to
Gunst, at least: Gunst retained all the stock he purchased during
the class period.  See Pugh, 521 F.3d at 695 ("[T]he fact that the
defendants are not alleged to have sold the stock at the inflated
prices meant that they stood to lose a lot of money if the value of
Tribune's stock fell.").   Finally, the fact that Hamburger and
Gunst received substantial bonuses tied to the company's
performance (see Compl. ¶ 408) does not support any inference of
scienter.   See, e.g., In re Bally Total Fitness Securities
Litigation, Nos. 04 C 3530 et al., 2006 WL 3714708, *9 (N.D. Ill.
July 12, 2006) ("Regarding the motive to earn bonuses and awards,
we agree with the view of numerous courts that these allegations
are too common among corporations and their officers to be
considered evidence of scienter.").

**E.   Whether the Fund Has Sufficiently Alleged Loss Causation**

At the pleading stage, the plaintiff must "provide a defendant
with some indication of . . . the causal connection" between the

- 32 -

defendant's misstatement or omission and the plaintiff's loss.
Dura Pharmaceuticals, Inc. v. Broudo, 544 U.S. 336, 347 (2005).
The Fund is pursuing a "fraud-on-the-market" loss-causation theory:
"[u]nder that theory, plaintiffs must show both that the
defendants' alleged misrepresentations artificially inflated the
price of the stock and that the value of the stock declined once
the market learned of the deception."  Ray v. Citigroup Global
Markets, Inc., 482 F.3d 991, 995 (7th Cir. 2007).  The truth may
emerge from a source other than the defendant, and in a series of
"partial or indirect disclosures" rather than all at once.  See,
e.g., Lormand v. US Unwired, Inc., 565 F.3d 228, 264 (5th Cir.
2009).  But it must emerge somehow to state a Rule 10b-5 claim on
a fraud-on-the-market theory.  See Transcontinental Indus., Ltd. v.
PricewaterhouseCoopers, LLP, 475 F.3d 824, 843 (7th Cir. 2007).
The plaintiffs in Transcontinental alleged that the defendant made
material misrepresentations in a 1997 audit statement that induced
the plaintiff to purchase stock in Anicom, Inc.  Id. at 842.  In
2000, Anicom's stock price fell after it disclosed misstatements in
its 1998 and 1999 financial statements.  Id. at 842-43.  The
district court dismissed the plaintiffs' complaint because Anicom's
disclosures about the 1998 and 1999 financial statements did not
disclose problems with the 1997 statements.  Id. at 842.  On
appeal, the plaintiffs argued that "[n]owhere in Dura does the
Supreme Court require that the precise fraud that resulted in the

underlying transaction be the subject of a later corrective disclosure in order to satisfy loss causation." Id. at 843. Our Court of Appeals rejected this argument and affirmed dismissal. See id. ("We cannot accept this rendition of Dura's requirements."). Anicom's revelations concerning its 1998 and 1999 financial statements did not make the problems with the 1997 audit "generally known," (id.), notwithstanding the plaintiffs' argument that the disclosed problems were part of the same "on-going scheme to overrepresent revenue and that the 1998 audit relied in part on historic information." Id. at 842.

The Fund, without distinguishing or even citing Transcontinental, cites district court cases for the proposition that so-called "corrective disclosures" need not explicitly reveal the fraud alleged in the complaint. See In re Motorola Securities Litigation, 505 F.Supp.2d 501, 546 (N.D. Ill. 2007) (rejecting a "fact-for-fact" disclosure requirement); see also In re Bradley Pharmaceuticals, Inc. Securities Litigation, 421 F.Supp.2d 822, 829 (D.N.J. 2006) (similar). Arguably, dicta in In re Motorola could be read to permit a plaintiff to state a Rule 10b-5 claim by alleging: (1) a disclosure seemingly unrelated to the alleged fraud; (2) a roughly contemporaneous drop in the stock price; and (3) a conclusory statement to the effect that the market must have learned truth. See In re Motorola, 505 F.Supp.2d at 536, 538, 540. The plaintiff could then try to establish through discovery that,

- 34 -

although the disclosure said one thing, the market really understood it to say another. That approach is inconsistent with <u>Transcontinental</u>: even at the motion-to-dismiss stage, we must scrutinize the content of the alleged disclosure. <u>See</u> <u>Transcontinental</u>, 475 F.3d at 842. If the Fund has not alleged a plausible link between the disclosures and the alleged fraud, then we must dismiss its complaint.[20]

According to the Fund, DeVry's stock price declined because the truth about its "predatory business model" leaked into the market in a series of partial disclosures: (1) a June 24, 2010 Health, Education, Labor and Pensions ("HELP") Committee report (Compl. ¶¶ 357, 362); (2) a July 1, 2010 Chicago Tribune article (<u>id.</u> at ¶ 364); (3) a July 15, 2010 SEC filing disclosing DeVry's responses to the HELP Committee's questions (<u>id.</u> at ¶¶ 365-67); (4) an August 3, 2010 New York Times article (<u>id.</u> at ¶ 370); (5) an August 4, 2010 Government Accountability Office ("GAO") report (<u>id.</u> at ¶ 372); (6) DeVry's announcement on August 6, 2010 that it had received a request for information from the HELP Committee (<u>id.</u> at ¶ 373); and (7) an August 13, 2010 DOE report disclosing student-

---

[20] <u>Cf.</u> <u>Dura</u>, 544 U.S. at 347-48 ("[A]llowing a plaintiff to forgo giving any indication of the economic loss and proximate cause that the plaintiff has in mind would bring about harm of the very sort the statutes seek to avoid. It would permit a plaintiff with a largely groundless claim to simply take up the time of a number of other people, with the right to do so representing an *in terrorem* increment of the settlement value, rather than a reasonably founded hope that the [discovery] process will reveal relevant evidence. Such a rule would tend to transform a private securities action into a partial downside insurance policy.") (citations and internal quotation marks omitted).

- 35 -

loan repayment rates at for-profit schools (id. at ¶¶ 385-87). (See Pl.'s Resp. at 42-43.)[21]

**1.    The HELP Committee Report**

On June 24, 2010 the HELP Committee released a report "draw[ing] on publicly available information to shed light on the scope of the Federal investment in for-profit schools and how these schools are using taxpayer dollars." (See "Emerging Risk?: An Overview of Growth, Spending, Student Debt and Unanswered Questions in For-Profit Higher Education" (hereinafter, "HELP Committee Report"), dated June 24, 2010, attached as Ex. Q to the Decl. of A. Salpeter in Supp. of Defs.' Reply Mem., at 1-2.)[22] The report cited publically available statistics indicating that for-profit schools were receiving increasing amounts of federal money in the form of student financial aid. (Id. at 2-4.) The schools devoted significant portions of this revenue to advertising, rather than to education, to further increase enrollment. (Id. at 5-6; see also id. at 5 ("Because Title IV aid is technically provided to students, the Federal government places no restrictions on how revenue from Title IV student aid may be used by schools.").) While profits at for-profit schools were rising, so too were

_____

[21] The Fund has abandoned its assertion (see Compl. ¶ 419) that the April 22, 2010 graduation-rate announcement was a corrective disclosure. (See Pl.'s Resp. at 43 n.11.)

[22] The complaint indicates that the HELP Committee conducted a public hearing on the same day that it released the report, but does not allege any details about the hearing. (Compl. ¶ 361.)

student-loan defaults.  (Id. at 5, 8-10.)  This "bleak" trend led
the Committee to question whether the students were receiving an
education adequate to obtain the types of jobs that would enable
them to pay down their debts.  (Id. at 8-9.)  The Committee also
noted that the disclosure requirements applying to for-profit
schools were insufficient to provide a detailed picture of the
industry, citing "numerous gaps in available data on for-profit
colleges."  (Id. at 10; see also id. at 11 ("Congress should seek
to fill those gaps to allow for an informed discussion and debate
over the significant federal investment in for-profit
institutions.").)

This report does not disclose any information that the
defendants allegedly concealed.  First, the HELP Committee Report
does not specifically identify DeVry, or any other school for that
matter.  Indeed, the Report explicitly disclaimed making any
pronouncements about particular schools.  (Id. at 11 (In a section
entitled "Scope and Methodology," the report states that "[i]t is
not meant to suggest that any one company or school is the focus of
this report . . . .").)  So, while the report referred generically
to "abusive recruiting,"[23] it did not reveal any information about
DeVry specifically.  (Id. at 1.)  Second, the references to

_____

    [23]    (See also id. at 6 ("[N]umerous accounts detail marketing and
recruiting practices that are sometimes overzealous or misleading") (citing
National Association for College Admission Counseling, "Higher Education Act
Fraud Alert," May 11, 2010); id. at 11 (referring to "mounting reports of
questionable practices and poor student outcome").)

improper recruiting were clearly secondary to the report's real thrust: for-profit schools (and their shareholders) were profiting from Title IV programs, but it was at best unclear whether taxpayers were getting their money's worth. The trends the report cites — increasing revenues from federal aid, low student retention, and high student-loan default rates — were apparent in information that was publically available to investors. The real news was that the HELP Committee was dissatisfied with those trends.

**2.  Chicago Tribune Article**

The Fund also cites a July 1, 2010 article entitled "Senator critical of for-profit colleges; Durbin seeks more regulation for some school [sic]." (Compl. ¶ 364.)[24] "Sen. Dick Durbin said Wednesday that legislation to strengthen regulation of for-profit schools was ahead, complaining that some of the schools leave students with whopping levels of debt and 'worthless diplomas'" Skiba, supra n. 24. According to the complaint, "[t]he article described how Senator Durbin specifically cited to large for-profit schools, including the University of Phoenix, Kaplan University and DeVry University." (Compl. ¶ 364.) The Fund embellishes this

---

[24] The defendants have attached to their reply memorandum a copy of a June 30, 2010 article entitled "Senator Slams For-Profit Colleges." See Katherine Skiba, Senator Slams For-Profit Colleges, Chi. Trib., June 30, 2010, http://articles.chicagotribune.com/2010-06-30/news/ct-met-durbin-criticizes-for-profit-c20100630_1_default-rate-for-profit-devry-university, attached as Ex. R to Decl. of A. Salpeter in Supp. of Defs.' Reply. This appears to be the online version of the article that the Fund cites as it includes, verbatim, the language that the Fund attributes to the July 1, 2010 article.

- 38 -

allegation in its opposition brief, stating that the article disclosed that DeVry was a "target" for regulation. (Pl.'s Resp. at 9, 42, 47; see also Pl.'s Resp. to Defs.' Mot. for Leave to File Add'l Authority (Apollo) at 8-9.) Here is the actual quote, from the online version at least: "Durbin, in remarks at the National Press Club, named the large chains — the University of Phoenix, Kaplan University and the Illinois-based DeVry University — **but did not single any out for bad practices**." Skiba, supra n. 24 (emphasis added). Virtually all of the specific criticisms that the article attributes to Senator Durbin were based on publicly available information about the schools. So, for example, Senator Durbin indicated during his remarks that "[t]he schools heavily rely on federal grants and loans, some for almost 90 percent of their revenues." Id. This was hardly new information, and it was permitted by the regulations in effect at that time. The closest the article comes to touching on the complaint's subject matter is the following: "[t]he schools, using aggressive marketing campaigns, tend to enroll women, many of them single parents, minorities, poor and first-generation college students. Military personnel and veterans are increasingly admitted." Id. It is a stretch to say that this disclosure alleges fraud at all: a marketing campaign can be "aggressive" without being deceptive, and it would be news only if for-profit schools tended *not* to enroll women and minorities. In any event, the article does not disclose

any fraud allegedly committed by the defendants.  We conclude that the Chicago Tribune article was not a corrective disclosure.

### 3.    DeVry's Answers to the HELP Committee's Questions

On July 15, 2010, DeVry published a detailed response to questions that members of Congress had posed during the HELP Committee's hearing on June 24, 2010.  (See Compl. ¶ 365; see also "Questions for the Record for Sharon Thomas Parrott," attached as Ex. N. to Compl.)  The Fund alleges in its complaint that DeVry's responses contained false statements and/or material omissions.  (Compl. ¶¶ 365-67.)  In its opposition brief, the Fund cites this document as one of the partial disclosures revealing DeVry's fraud.  (Pl.'s Resp. at 42-43.)  It might contain both "old lies" and "new truths," to borrow the defendants' phrase, but the Fund does not attempt to explain how this document revealed information about DeVry's alleged conduct.  See Nelson v. Napolitano, 657 F.3d 586, 590 (7th Cir. 2011) ("Neither the district court nor this court are obliged to research and construct legal arguments for parties, especially when they are represented by counsel.").

### 4.    New York Times Article & GAO Report

On August 3, 2010, a New York Times article disclosed details of an undercover GAO investigation of 15 for-profit colleges.  (Compl. ¶ 370.)  The article stated that recruiters at 4 of the 15 colleges encouraged applicants to lie on financial-aid applications, and that "all 15 misled potential students about

their programs' cost, quality and duration, or the average salary
of graduates . . . ." (Id.)  The article cited some behavior that
is more egregious than anything that the Fund's confidential
witnesses report.  (See, e.g., id. ("At one college in Texas, a
recruiter encouraged the undercover investigator not to report
$250,000 in savings, saying it was 'not the government's
business.'").)  But other findings in the report are in line with
the complaint's allegations: overstating the value of particular
programs, requiring students to pay an application fee before
receiving financial-aid information, and assisting prospective
students with the entrance exam.  (Id.)  The article also stated
that "in some instances, the report said, the applicants were given
accurate and helpful information, about likely salaries and not
taking out more loans than they needed."  (Id.)  The GAO released
its report the following day, August 4, 2010, disclosing findings
consistent with what the New York Times had reported.  (Id. at ¶
372; see also "Undercover Testing Finds Colleges Encouraged Fraud
and Engaged in Deceptive and Questionable Marketing Practices"
(hereinafter, "GAO Report"), attached as Ex. I to Defs.' Mem.)

The GAO Report is more relevant to the complaint's subject
matter than the other disclosures we have discussed so far.  The
question is whether conduct at 15 other, "nonrepresentative"

schools discloses anything about DeVry.[25]  The Fund relies primarily on the Fifth Circuit's decision in Lormand to support its argument that revelations about a third party may disclose the truth about the defendant.  (Pl.'s Resp. at 46.)  The corporate defendant in Lormand, US Unwired, Inc., operated as an affiliate of Sprint Corporation.  Lormand, 565 F.3d at 233.  Sprint forced US Unwired and other Sprint affiliates to participate in a nationwide program designed to increase Sprint's market share by eliminating deposit requirements for customers with poor credit.  Id. at 234-35.  As documented in internal communications between US Unwired's senior executives, "the defendants knew, from previous experience, this business strategy would be financially disastrous for US Unwired, given the demographics of its designated network areas."  Id. at 235, 237.  Despite this knowledge, the defendants issued public statements touting the new program.  Id. at 236.  The plaintiffs alleged that the truth about the no-deposit initiative's poor performance "leaked out" in a series of public disclosures.  Id. at 259.  The first such disclosure was a "warning issued by AirGate PCS, another Sprint affiliate, that it would not meet its subscriber growth forecast due to the reinstatement of the deposit

---

[25]/  (See GAO Report at 2 ("To determine whether for-profit college representatives engaged in fraudulent, deceptive, or otherwise questionable sales and marketing practices, we investigated a nonrepresentative selection of 15 for-profit colleges located in Arizona, California, Florida, Illinois, Pennsylvania, Texas, and Washington D.C."); Trans. of HELP Committee Proceedings, dated Aug. 4, 2010, attached as Ex. H to Defs.' Mem. (testimony by the author of the GAO Report identifying the schools that the GAO investigated, not including DeVry).)

requirement for its ClearPay [no-deposit] customers." Id.
Subsequent disclosures confirmed that the problems affected
Sprint's "entire network system," id. at 261, culminating in US
Unwired's disclosure that it was suffering the same financial
consequences. Id. ("These final disclosures squarely aligned US
Unwired with previous disclosures concerning the severe negative
effect of the sub-prime credit class programs on similarly situated
sister Sprint affiliate companies and the entire Sprint network.").

Lormand is distinguishable in at least two key respects.
First, the Fifth Circuit emphasized that the other Sprint
affiliate's experience was highly relevant and probative:

> Plausibly, the series of disclosures here began with the
> revelation that AirGate, a sister Sprint affiliate in
> substantially the same business, a company in
> substantially the same business as US Unwired [sic], and
> having substantially the same relationship with Sprint as
> US Unwired, had been seriously damaged by the same
> sub-prime customer programs implemented by US Unwired and
> consequently had been forced to terminate those programs
> and reinstate the deposit requirement for its ClearPay or
> sub-prime credit class customers.

Id. at 261. Devry and the schools that the GAO investigated are
not "affiliated:" they are merely in the same industry. See In re
Apollo Group, Inc. Securities Litigation, Nos. CV-10-1735-PHX-JAT
et al., 2011 WL 5101787, *18 (D. Ariz. Oct. 27, 2011) ("Plaintiffs
have not sufficiently alleged facts showing how the fact that
for-profit schools were being investigated was understood by the
market as realization of fraud being conducted by Defendants at
Apollo."); cf. Metzler, 540 F.3d at 1063-64 (concluding that DOE

sanctions at one of the defendant's schools did not disclose the widespread enrollment fraud alleged the plaintiff's complaint).[26] Second, the plausible inference that the Fifth Circuit drew from AirGate's experience was confirmed by US Unwired's later disclosure that it suffered similar consequences from Sprint's no-deposit initiative. Id. at 261-62. The entire sequence "plausibly reveal[ed], as a whole, the leaking out of the truth underlying US Unwired's prior misrepresentations" about the initiative's consequences. Id. at 262 (emphasis added). Like the courts in In re Motorola and In re Bradley, the Lormand court was working backwards from an unequivocal disclosure to find evidence that the information had leaked into the market earlier. See In re Motorola, 505 F.Supp.2d at 542 (distinguishing Transcontinental on the ground that the plaintiff in that case "failed to allege that truth about the misrepresentation upon which it relied ever made its way into the marketplace") (emphasis in original); In re Bradley, 421 F.Supp.2d at 829 (concluding that the information contained in the defendants' earnings restatement was partially

---

[26]/ The Fund attempts to distinguish Metzler on the grounds that "the loss causation disclosure there involved a limited investigation at one of the company's 88 campuses where the stock price rebounded within 3 days." (Pl.'s Resp. at 46 n.12.) The fact that the investigation involved one of the defendant's schools strengthens (rather than weakens) the case for applying Metzler's reasoning here. In Metzler, at least, investors might infer that the defendant exercised some oversight at the campus where the DOE found the violations. DeVry has no control over its competitor's recruiting practices. It is true that the Metzler defendant's stock quickly rebounded after the disclosure, but that detail only buttressed the court's conclusion that the market did not adopt the plaintiff's strained interpretation of the article. See Metzler, 540 F.3d at 1064. There is no indication in the court's opinion that it would have reached a different conclusion if the stock had not rebounded.

- 44 -

disclosed earlier when it announced that it was being investigated

by the SEC and would delay its earnings announcement).[27]   As we

discuss below, the "truth" that the defendants allegedly concealed

was not revealed in any subsequent disclosure.

### 5. DeVry's Announcement that it Received a Request for Information from the HELP Committee

DeVry announced on August 6, 2010 that it had received a

request for information from the HELP Committee on a host of

subjects including DeVry's recruiting practices.  (See Compl. ¶

373.)[28]   The Fund argues that this is a corrective disclosure,

citing cases holding that the market may learn about fraud through

the announcement of an SEC investigation.  (Pl.'s Resp. at 45.)

---

[27]/   See also In re Take-Two Interactive Securities Litigation, 551 F.Supp.2d 247, 258 (S.D.N.Y. 2008) (SEC filed and settled charges of stock-option backdating confirming that the earlier announcement of the SEC investigation disclosed the "truth"); In re IMAX Securities Litigation, 587 F.Supp.2d 471, 485 (S.D.N.Y. 2008) ("The SEC inquiry related directly to the misrepresentations alleged in this case—the application of multiple element accounting to theater system revenue—and culminated in the restatement of IMAX's earnings and revenues for fiscal years 2002 through 2005.") (citation and internal quotation marks omitted).

[28]/   "On August 6, 2010, DeVry Inc. announced that it had received a request for information from the U.S. Senate Committee on Health, Education, Labor and Pensions relating to the Committee's ongoing hearings relating to private-sector colleges receiving Title IV financial aid. The request seeks information to more accurately understand how DeVry's institutions use Federal resources, including how they recruit and enroll students, set program price or tuition, determine financial aid including private or institutional loans, track attendance, handle withdrawal of students and return of Title IV dollars and manage compliance with the requirement that no more than 90% of revenues come from Title IV dollars. The request also seeks an understanding of the number of students who complete or graduate from programs offered by DeVry's institutions, how many of those students find new work in their educational area, the debt levels of students enrolling and completing programs and how DeVry tracks and manages the number of students who risk default within the cohort default rate window."  DeVry Form 8-K, dated August 6, 2010, available at http://www.sec.gov/Archives/edgar/data/730464/000115752310004880/a6389364.htm (last visited Feb. 13, 2012).

There is a split of authority among district courts about whether the announcement of an SEC investigation is a corrective disclosure.  Compare In re Maxim Integrated Products, Inc. Securities Litigation, 639 F.Supp.2d 1038, 1047 (N.D. Cal. 2009) (the announcement of an SEC investigation is not a corrective disclosure because it only reveals the "potential" for fraud); with In re Take-Two, 551 F.Supp.2d at 286 (concluding that the announcement of an SEC investigation may constitute a corrective disclosure).  But even applying the more inclusive standard, we do not believe that the August 6, 2010 announcement is a corrective disclosure.  In In re Take-Two, the defendant announced that the SEC was investigating "certain stock option grants," and that the company was conducting its own internal investigation.  In re Take-Two, 551 F.Supp.2d at 286.  The court concluded that the plaintiff's complaint alleged a sufficient connection between that disclosure and the defendant's alleged misrepresentations.  Id. at 288.  In doing so, it distinguished In re Avista Corp. Securities Litigation, 415 F.Supp.2d 1214, 1220 (E.D. Wash. 2005), which held that the announcement of a Federal Energy Regulatory Commission ("FERC") investigation was not a corrective disclosure.  See In re Take-Two, 551 F.Supp.2d at 287-88; see also In re Avista Corp., 415 F.Supp.2d at 1220 ("The Court determines that Plaintiffs fail to allege loss causation because the two FERC orders do not contain factual information that reveals any of these misrepresentations or

reveals any fraud by Avista"). "[T]he announcement of a [FERC] investigation does not immediately call into question a company's prior representations and securities sales in the same manner as does an investigation carried out by the SEC." In re Take-Two, 551 F.Supp.2d at 287-88. There is no indication here that the HELP Committee had any authority to sanction DeVry for Title IV violations, or that its broad request for information was a first step in that direction. Indeed, the FERC orders in In re Avista, which the court concluded did not reveal the defendant's alleged fraud, were much more pointed than the general request for information that DeVry received from the HELP Committee. See In re Avista, 415 F.Supp.2d at 1219 ("The Show Cause Order and the Initiating Order disclosed to investors that the FERC believed Avista had not cooperated in its investigation, that it might have manipulated the energy market, and that the FERC intended to investigate the matter."). We conclude that the August 10, 2010 announcement was not a corrective disclosure.[29]

### 6. The August 13, 2010 DOE Report

On July 26, 2010, the DOE proposed "gainful employment" regulations that would condition a program's Title IV eligibility

---

[29]/ We acknowledge that the District Court of Arizona reached a different conclusion with respect to a HELP Committee request directed to another for-profit school. See In re Apollo Group, 2011 WL 5101787, *17. The court appeared to reason that the request for information was comparable to the specific finding of wrongdoing that the DOE had made earlier with respect to the defendant in that case. Id. We respectfully disagree with that analysis. A specific finding of wrongdoing consistent with the plaintiff's fraud allegations is the paradigmatic corrective disclosure. A broad request for information from a government committee with no apparent enforcement authority is equivocal, at best.

on maintaining certain student repayment rates and debt-to-income ratios.  See Program Integrity: Gainful Employment, 75 Fed. Reg. 43,616, 43,618 (proposed July 26, 2010).[30]  On August 13, 2010, the DOE released "data and technical documentation behind the Department's estimates of the impact of the proposed regulation." ("Release of Data and Technical Documentation for NPRM on Gainful Employment," dated Aug. 13, 2010 (hereinafter, "DOE Release"), attached as Ex. D to Decl. of A. Salpeter in Supp. of Defs.' Mot. to Dismiss, at 1; see also Compl. ¶ 385.)  The DOE presented the data on an "institution-by-institution" basis, and showed a repayment rate of 38% at Devry University for fiscal year 2009. (See id. at 1; see also Estimated Repayment Rates by Institution - FY 2009, attached as Ex. D to Decl. of A. Salpeter in Supp. of Defs.' Mot. to Dismiss, at 1; Compl. ¶ 386.)[31]  Pursuant to the proposed rule, "[p]rograms whose former students have loan repayment rates below 45 percent but at least 35 percent may be placed on restricted status."  75 Fed. Reg. at 43,618.  The DOE cautioned, however, that "it is not possible to use these data to determine the impact of the proposed rule on any particular institution," emphasizing in particular that the debt-to-income

---

[30]/  The "repayment rate" was a new metric, distinct from the cohort-default rate. (See DOE "Frequently Asked Questions," dated Aug. 24, 2010, attached as Ex. E to Defs.' Mem., at 2-3; see also id. at 4-5 (explaining why "the repayment rates show many more students struggling to repay their loans than default rates do.").)

[31]/  Other DeVry "institutions" reported higher or lower repayment rates. (See, e.g., Estimated Repayment Rates by Institution - FY 2009 at 1 (DeVry University - Chicago Loop: 57%; DeVry University - Decatur: 25%).)

ratios had not been calculated.  (DOE Release at 1.)  Shortly after announcing the repayment-rate data, the DOE released a statement again emphasizing that debt-to-income ratios had not been calculated, and estimating that when they were taken into account "two-thirds of the programs with repayment rates below 35% would remain fully eligible . . . ."  (See DOE "Frequently Asked Questions," dated Aug. 24, 2010, attached as Ex. E to Decl. of A. Salpeter in Supp. of Defs.' Mot. to Dismiss, at 2.)

The Fund alleges that the repayment-rate data that the DOE released on August 13, 2010 revealed the "ultimate truth" that the defendants had been hiding.  (Compl. ¶ 385.)  "Based on the proposed regulations, many of DeVry's programs are in jeopardy of losing their financial aid status."  (Id. (emphasis added).)  The Fund has not explained (or even attempted to explain) how a future risk of losing financial-aid eligibility based upon newly proposed regulations undermines any of the defendants' previous statements. We conclude that the August 13, 2010 DOE report did not disclose the defendants' alleged fraud.  See Apollo, 2011 WL 5101787, *19 ("The Court finds that Plaintiffs have not sufficiently alleged facts showing how Apollo's repayment rates or the DOE's staffing were understood by the market as a realization of fraud being conducted by Defendants.").  In sum, the Fund's theory — that the market learned about DeVry's fraud even though no fraud was ever disclosed — does not "hold together."  See Swanson v. Citibank,

N.A., 614 F.3d 400, 404 (7th Cir. 2010). It has not adequately alleged loss causation. See Transcontinental, 475 F.3d at 843.

**F.    The Fund's Control Person Claim**

Because the Fund has failed to adequately allege a primary securities law violation, its control-person claim likewise fails. See, e.g., In re Allscripts, Inc. Securities Litigation, No. 00 C 6796, 2001 WL 743411, *12 (N.D. Ill. June 29, 2001) ("If a Complaint does not adequately allege an underlying violation of the securities laws . . . the district court must dismiss the section 20(a) claim.").

**G.    Dismissal is Without Prejudice**

The defendants ask us to dismiss the Fund's complaint with prejudice. Given our conclusions about its loss-causation allegations, the Fund faces an uphill battle. Indeed, the Fund has not identified any disclosure even touching upon recruiter compensation, the complaint's strongest (although still deficient) allegations. But we cannot say with certainty that it cannot correct the problems we have identified in the complaint. We will give the Fund a second (and likely final) opportunity to amend it.

**CONCLUSION**

Defendants' motion to dismiss plaintiff's complaint [33] is granted. Plaintiff is given leave to file a second amended complaint by May 4, 2012 that cures the deficiencies we have identified with its claims, if it can do so. If plaintiff chooses

- 50 -

not to file a second amended complaint by that date, we will dismiss this case with prejudice.  A status hearing is set for May 16, 2012.


DATE:        March 27, 2012


ENTER:       _____

John F. Grady, United States District Judge