IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| BOCA RATON FIREFIGHTERS' AND POLICE PENSION FUND and WEST PALM BEACH FIREFIGHTERS PENSION FUND, individually and on behalf of all others similarly situated, | ) ) ) ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | No. 10 C 7031 |
| DEVRY INC., DANIEL HAMBURGER, and RICHARD M. GUNST, | ) ) ) | |
| Defendants. | ) ) | |

## MEMORANDUM OPINION

Before the court is the defendants' combined motion to strike and to dismiss.  For the reasons explained below, we deny the defendants' motion to strike and grant their motion to dismiss.

## BACKGROUND

We will assume that the reader is familiar with our earlier decision dismissing Boca Raton Firefighters' and Police Pension Fund's ("Boca Raton") amended complaint.  See Boca Raton Firefighters' and Police Pension Fund v. Devry, Inc., No. 10 C 7031, 2012 WL 1030474 (N.D. Ill. Mar. 27, 2012).  However, a brief overview of our decision will be helpful.  Boca Raton's previous complaint alleged that the defendants — DeVry, Inc., Daniel Hamburger (DeVry's president and CEO), and Richard Gunst (DeVry's CFO) — made dozens of public statements that concealed DeVry's

"systematically predatory business model." Id. at *1. Boca Raton
described five general categories of alleged wrongdoing: (1) high-
pressure recruiting tactics; (2) deceptive enrollment practices;
(3) illegal recruiter compensation; (4) misleading graduate-
employment statistics; and (5) undisclosed risks to DeVry's
eligibility to receive federal financial aid. Id. at *3-10. We
concluded that Boca Raton had failed to allege with the
particularity required by the Private Securities Litigation Act of
1995 ("PSLRA") that the defendants' statements were false. Id.;
see also 15 U.S.C. § 78u-4(b)-1. We observed that its recruiter-
compensation allegations were stronger than the other categories of
alleged wrongdoing, but concluded that those allegations were still
deficient: only one confidential witness ("CW") supported the
relevant allegations with the detail that the PSLRA requires. See
Boca Raton, 2012 WL 1030474, *7 ("[W]e are reluctant to permit a
securities class action to proceed based on statements from a
single anonymous employee."). We also concluded that Boca Raton
had not alleged facts creating a "strong inference" that the
defendants had acted with the necessary state of mind. See id. at
*10-12; see also 15 U.S.C. § 78u-4(b)(2)(A). Once again, we
suggested — without deciding — that the inference of scienter was
stronger as it pertained to Boca Raton's recruiter-compensation
allegations. See Boca Raton, 2012 WL 1030474, *11 ("[I]f DeVry
paid recruiters 'variable bonuses' tied to enrollment, is it likely

that the defendants did not know that when they *specifically* told investors otherwise?") (emphasis in original). Finally, we held that Boca Raton had not adequately alleged that the defendants' fraud had caused its losses. See id. at *13-18. According to Boca Raton, the truth about DeVry's "predatory business model" had emerged in a series of partial disclosures during the summer of 2010, causing its stock price to drop. See id. at *14. We held that the purported disclosures, which dealt largely with industry-wide (not DeVry-specific) issues, did not reveal the defendants' alleged fraud. See id. at *14-18. We gave Boca Raton leave to amend its complaint, but expressed skepticism that it could overcome the fundamental problems with its claims: "[g]iven our conclusions about its loss-causation allegations, the Fund faces an uphill battle. Indeed, the Fund has not identified any disclosure even touching upon recruiter compensation, the complaint's strongest (although still deficient) allegations." See id. at *19.

In response to our opinion, Boca Raton substantially overhauled the theory underlying its Rule 10b-5 claim. Instead of alleging a host of loosely related "predatory practices," Boca Raton's claims are now based solely on DeVry's recruiter-compensation policies. (See Second Am. Compl. ¶¶ 54-151.) It has also articulated an entirely new loss-causation theory. It now alleges that the truth about DeVry's illegal recruiter-compensation practices emerged in *August 2011* — ten months after Boca Raton

filed this lawsuit.  (See id. at ¶¶ 360-370.)  The defendants
contend that these changes do not correct the fundamental defects
with Boca Raton's claims.  But before addressing the defendants'
motion to dismiss, we will briefly address their motion to strike.

In their opening brief, the defendants argued that Boca Raton
lacked standing to sue for public statements that the defendants
made after May 13, 2010, the date that it last purchased DeVry
stock.  (See Def.'s Mem. 19-20); see also Roots Partnership v.
Lands' End, Inc., 965 F.2d 1411, 1420 (7th Cir. 1992)
("[P]ost-purchase statements cannot form the basis of Rule 10b-5
liability, because the statements could not have affected the price
at which plaintiff actually purchased.").  On that basis, the
defendants moved to strike allegations based on those statements as
"immaterial."  See Fed. R. Civ. P. 12(f).  In response to the
defendants' motion, Boca Raton moved to amend its complaint to add
an additional plaintiff — West Palm Beach Firefighters' Pension
Fund ("WPB").  WPB last purchased DeVry stock on May 11, 2011,
which is the date of the last alleged misrepresentation in the
Second Amended Complaint.  (See Second Am. Compl. ¶ 336.)  The
defendants objected that the amendment was a stall tactic, not that
the proposed amendment would not cure the standing problem.  (See
Defs.' Opp'n to Pl.'s Mot. to Amend, Dkt. 92.)  We overruled the
defendants' objection and granted Boca Raton leave to file an
amendment to the complaint adding WPB as a plaintiff.  (See Am. to

Second Am. Compl., Dkt. 96.)[1]  WPB clearly has standing to sue for the defendants' statements after May 13, 2010.  Therefore, the defendants' motion to strike is denied.  We turn now to their motion to dismiss.

## A.  Legal Standard

Count I of the Second Amended Complaint alleges that the defendants violated Rule 10b-5.  In order to prevail on this claim, the Funds must establish the following: "(1) the defendant made a false statement or omission (2) of material fact (3) with scienter (4) in connection with the purchase or sale of securities (5) upon which the plaintiff justifiably relied and (6) that the false statement proximately caused the plaintiff damages." Makor Issues & Rights, Ltd. v. Tellabs, Inc., 437 F.3d 588, 595 (7th Cir. 2006) (rev'd on other grounds by Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308 (2007)) (hereinafter, "Tellabs I").  The defendants argue that the Funds still have not adequately alleged facts supporting elements (1), (3), and (6).  (See Defs.' Mem. at 18-19.)  The Funds' falsity and scienter allegations are subject to the PSLRA's "[e]xacting pleading requirements." Tellabs, 551 U.S. at 313; see 15 U.S.C. § 78u-4(a)(1).  We discuss those requirements in greater detail below.  This heightened pleading standard does

_____

[1]  For the parties' convenience and our own, we gave Boca Raton leave to file a separate amendment to the complaint — rather than an entirely new complaint — in order to preserve the Second Amended Complaint's pagination. References in this opinion to the "Second Amended Complaint" refer to that complaint as amended to add WPB as a plaintiff.  Going forward, we will refer to the plaintiffs collectively as the "Funds" unless otherwise noted.

not apply to the Funds' proximate cause (so-called "loss causation") allegations. See, e.g., Ong ex rel. Ong v. Sears, Roebuck & Co., 459 F.Supp.2d 729, 742-43 (N.D. Ill. 2006) (concluding that loss-causation allegations are governed by Fed. R. Civ. P. 8(a)(2)) (collecting cases). When assessing the Funds' complaint we "must, as with any motion to dismiss for failure to plead a claim on which relief can be granted, accept all factual allegations in the complaint as true." Tellabs, 551 U.S. at 322.

## B. The Defendants' Class-Period Statements

The Funds continue to assert that apparently accurate statements about DeVry's enrollment and revenues are false because they did not reveal the company's allegedly illegal recruiter-compensation practices. (See Second Am. Compl. ¶¶ 152, 155-56, 162-63, 166-67, 175-76, 180-82, 185, 191-93, 201-02, 204-05, 210-14, 216-17, 223, 227, 229, 231, 232, 237, 239, 241-42, 246, 252-53, 256-58, 261, 263, 266-67, 286, 289, 297, 299, 300, 302, 310-11, 314-15, 322-23, 328, and 332-33.) We previously rejected similar allegations and the Funds have not attempted to show that our ruling was incorrect. See Boca Raton, 2012 WL 1030474, *2; see also In re Advanta Corp. Securities Litigation, 180 F.3d 525, 538 (3d Cir. 1999) (abrogated on other grounds by Tellabs, 551 U.S. at 325 as recognized in Institutional Investors Group v. Avaya, Inc., 564 F.3d 242, 277 (3d Cir. 2009)) ("Factual recitations of past earnings, so long as they are accurate, do not create liability

under Section 10(b)."). This leaves (1) statements that DeVry complied with recruiter-compensation regulations (see, e.g., Second Am. Compl. ¶ 179), (2) statements addressing the impact of new recruiter-compensation regulations (see, e.g., id. at ¶ 319), and (3) statements attributing the company's success to reasons other than its allegedly illegal conduct (see, e.g., id. at ¶ 157).[2]

## C. Whether the Funds Have Sufficiently Pled That the Defendants' Class-Period Statements Were False

The Funds' complaint must "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed." 15 U.S.C. § 78u-4(b)(1). This "particularity" requirement applies to allegations outside the plaintiff's personal knowledge, including allegations based upon counsel's interviews with confidential witnesses. See Taubenfeld v. Career Educ. Corp., No. 03 C 8884, 2005 WL 350339, *8 (N.D. Ill. Feb. 11, 2005). Applying this standard, we ask "whether the facts alleged are sufficient to support a reasonable belief as to the misleading nature of the statement or omission." Tellabs I, 437 F.3d at 595 (citation and internal quotation marks omitted).

---

[2] We assumed in our earlier opinion that statements within this third category were actionable, despite some disagreement in the case law. See Boca Raton, 2012 WL 1030474, *2 n.5 (collecting cases). The defendants have not asked us to revisit that issue, (see Defs.' Mem. at 22), so we will not do so here.

The Funds have identified 26 confidential witnesses as the source for their allegations about DeVry's recruiter-compensation practices. (See Second Am. Compl. ¶¶ 21-49.) They have sufficiently described where, when, and in what capacity these witnesses worked while employed by DeVry. (See id. at ¶¶ 21-49); see also Tellabs I, 437 F.3d at 596; Boca Raton, 2012 WL 1030474, *3. In addition, the Funds have remedied the vagueness and ambiguity that we identified in the previous complaint about the sources for particular allegations. Cf. Boca Raton, 2012 WL 1030474, *3-4. The thrust of the parties' dispute is whether the CW's statements support a reasonable belief that the defendants' class-period statements were false.

1. **Higher Education Act ("HEA") Recruiter-Compensation Regulations**

The HEA prohibits schools from providing "any commission, bonus, or other incentive payment based directly or indirectly on success in securing enrollments or financial aid to any persons or entities engaged in any student recruiting or admission activities or in making decisions regarding the award of student financial assistance." 20 U.S.C.A. § 1094 (20). In 1992, the Department of Education ("DOE") adopted "Safe Harbors" permitting, among other things:

> [t]he payment of **fixed compensation**, such as a fixed annual salary or a fixed hourly wage, as long as that compensation is not adjusted up or down more than twice during any twelve month period, and any adjustment is not based **solely** on the number of students recruited, admitted, enrolled, or awarded financial aid. For this

purpose, an increase in fixed compensation resulting from a cost of living increase that is paid to all or substantially all full-time employees is not considered an adjustment.

34 C.F.R. § 668.14(b)(22)(ii)(A) (emphasis added). On May 26, 2009, the DOE announced its intent to review its incentive compensation regulations, among other issues. See Negotiated Rulemaking Committees; Establishment, 74 Fed. Reg. 24,728-01 (May 26, 2009) (stating that the DOE intended to convene a committee to evaluate "[i]ncentive compensation paid by institutions to persons or entities engaged in student recruiting or admission activities"). That same week, DOE Deputy Undersecretary Robert Shireman participated in a conference call with industry analysts. See Trans. of Conf. Call, dated May 29, 2009, available at h t t p : / / w w w 2 . e d . g o v / p o l i c y / h i g h e r e d /reg/hearulemaking/2009/call-analysts.pdf. During that call, Shireman specified that the DOE was evaluating whether the Safe Harbors should be revised or eliminated. See id. at 5. The DOE ultimately announced proposed regulations on June 18, 2010 that, if adopted, would eliminate the Safe Harbors altogether. See Program Integrity Issues, 75 Fed. Reg. 34806-01 (proposed June 18, 2010). In support of the proposed change, the DOE observed that the "fixed compensation" Safe Harbor had "led institutions to establish, on paper, other factors that are purportedly used to evaluate student recruiters other than the sheer numbers of students enrolled. However, in practice, consideration of these factors has been minimal at best, or otherwise indiscernible." See id. at 34817.

The DOE adopted the proposed amendments on October 29, 2010, which took effect July 1, 2011, shortly before the end of the class period.

### a. Statements Indicating DeVry's Compliance with the pre-July 2011 Regulations

*Illegal Bonuses and Other Perks.* In the previous complaint, a person identified as CW 9 stated that he/she received between 40% and 60% of his/her compensation in the form of a "variable bonus" that was based on the number of students he/she enrolled. (See Am. Compl., Dkt. 27, ¶ 169.) He/she also received a salary, but "that could only increase by a few percentage points each year." (Id.) The Safe Harbor only applies to "fixed compensation," so the payment of a bonus based upon enrollment would be a clear HEA violation. See Boca Raton, 2012 WL 1030474, *7. Moreover, the existence of such bonuses would tend to suggest a company-wide policy violating the HEA. See id. ("[U]nlike some of the Fund's other allegations, we think it is reasonable to extrapolate DeVry's compensation policy from the experiences of 'front line' employees ."). But we were unwilling to find that Boca Raton had established a false statement based upon statements from one confidential witness. See id.[3] The Funds still have not identified any CW corroborating CW 9's (now CW 6's) contention that he/she received an illegal bonus. (See Second Am. Compl. ¶ 74.) CW 16 states that

---

[3] Other witnesses also discussed DeVry's recruiter compensation policies, but they did not do so with the particularity that the PSLRA requires. See Boca Raton, 2012 WL 1030474, *7.

he/she received "awards based on enrollment numbers, and that one of those rewards came with a check for $1,500." (See id. at ¶ 92.) But it is not clear — as it would have been if the Funds had established the existence of an illegal bonus plan — that CW 16's "award" indicates a company-wide practice. CW 1 states that top recruiters were awarded "trips and prizes" and that those in the running for such awards were identified in a list that was "communicated 'nationally' from the top down to all of the 90-plus DeVry campuses." (See id. at ¶ 64.) CW 16 and CW 1 may be referring to the same awards program, but there are no allegations making that connection. These two uncorroborated statements are insufficient to impugn the defendants' class-period statements.[4]

*Illegal Fixed Compensation*. The Funds also allege that DeVry paid "fixed compensation" to its employees based "solely" on the number of students that they enrolled. The Funds' CW's indicate that they received a base salary and a "variable" salary. (See id. at ¶¶ 62-65, 69-72, 74-75, 77, 82, 85, 87-88, 90, 92-93, 94-95.) The amount of the "variable" portion of their salary varied

---

[4] The Funds are on somewhat firmer ground when they allege that the recruiters who enrolled the most students received a free trip to DeVry's "Pride" convention and related benefits. (See Second Am. Compl. ¶¶ 64, 67-68.) However, those stray allegations — barely a paragraph's worth of material in the Funds' 156-page complaint — form no part of the Funds' loss-causation theory. As we discuss supra, the Funds argue that DeVry implicitly disclosed that its recruiter-compensation practices were illegal when it announced in August 2011 that the new HEA regulations contributed to a decline in enrollments at some DeVry schools. There is no allegation that DeVry ever stopped paying its top recruiters' expenses in connection with the "Pride" convention. So, there is not even an arguable basis to conclude that the results that DeVry announced in August 2011 implicitly revealed that DeVry had made such payments.

according to their "level," with higher level recruiters eligible to receive larger salaries. (See id. at ¶¶ 71-72, 93, 100.) Every six months the employees were evaluated and if they met or exceeded their enrollment quotas, they could receive 100% or more of their "variable" salary. (See, e.g., id. at ¶¶ 62, 70-71.) If they missed their enrollment targets, the "variable" portion of their salaries decreased. (See, e.g., id. at ¶¶ 62, 68-69, 79.) These adjustments were purportedly based upon a combination of enrollment success and so-called "TEACH"[5] criteria — non-enrollment factors such as good behavior and timeliness. (See id. at ¶ 58; see also id. at ¶ 79.) The Funds' CW's state that the TEACH factors were pretextual: their variable salaries were based "solely" on the number of students that they enrolled. (See id. at ¶¶ 68, 73, 75, 83, 92, 98, 102, and 107.)

The defendants argue that we should disregard these allegations because they are not sufficiently "particularized." (Defs.' Mem. at 25.) We think that the defendants are setting the PSLRA bar too high. Several of the Funds' CW's provide concrete details about how the compensation system worked in practice. For example, CW 11 states that he/she consistently received high TEACH ratings when he/she met enrollment expectations. (See Second Am. Compl. ¶ 84.) The one time that he/she missed the enrollment

---

[5] The Funds allege that "TEACH" stands for "Teamwork, Employee Focus, Achieving, Continuously Improving, and Helping Students Achieve Their Goals." (See Second Am. Compl. ¶ 3 n.1.)

targets, his/her TEACH ratings fell significantly. (See id.)
His/her TEACH ratings "went 'right back up' at the end of the next
session when CW 11 again hit her/his enrollment targets." (Id.)
This is consistent with the experiences of several other
recruiters. (See id. at ¶¶ 68, 73, 75, 83, 92, 98, 102, and 107.)
We presume that these employees, some of whom worked for DeVry for
several years, have personal knowledge about how they were
evaluated and paid. In addition, two management-level employees —
CW 24 (Director of Admissions) and CW 25 (Associate Director of
Admissions) — confirm that TEACH ratings were irrelevant. (See id.
at ¶¶ 47-48, 105, 107.) Two CW's state that they received TEACH
ratings that were not in line with their enrollment numbers. CW 2
states that he/she received the "best possible scores" on the TEACH
criteria, but did not meet his/her enrollment targets and was fired
on that account. (See id. at ¶ 64.) CW 17 states that his/her
TEACH ratings "weren't the greatest," but nevertheless he/she
consistently received raises because he/she met or exceeded
enrollment targets. (See id. at ¶ 94.) These statements suggest
that DeVry's fixed-compensation practices were not formalized, but
they are consistent with the Funds' general allegations that TEACH
ratings did not affect compensation. We conclude that these
allegations are sufficiently clear and particularized to pass
muster under the PSLRA.

The defendants also argue that the allegations do not establish a problem of sufficient magnitude to undermine their statements about the company as a whole. (See Defs.' Mem. at 28.) This was a significant problem with the previous complaint, which relied heavily on loosely related anecdotes of misconduct. See Boca Raton, 2012 WL 1030474, *5. However, the Funds' recruiter-compensation allegations are more concrete. The Funds' CW's describe a consistent practice across multiple campuses, and it stands to reason that the company's recruiters — and the individuals evaluating them — would know how DeVry's recruiter-compensation policy worked in practice. This inference is somewhat weakened by the Funds' belated attempt to limit their claims to DeVry University, one of the several schools owned and operated by DeVry, Inc. (See Pls.' Resp. at 3 n.5.) And it could be, as the defendants suggest, that the CW's are mistaking correlation for causation. (See Defs.' Reply at 8.) But even under the PSLRA, the Funds are not required to prove their claims at this stage of the case. We conclude that the Funds have sufficiently alleged that the defendants' class-period statements were false based upon DeVry's allegedly illegal fixed-compensation practices.

### b. The Defendants' Statements Regarding the New Incentive Compensation Regulations

During the class period, the defendants made several statements about the anticipated impact of new incentive-compensation regulations. (See Second Am. Compl. ¶¶ 221, 303, 306,

318, 319, 330.)  On October 26, 2011 — three days before the DOE
announced that it would, in fact, eliminate the Safe Harbors —
Gunst and Hamburger participated in a conference call with analysts
and investors.  (See id. at ¶¶ 303-308.)  In response to an inquiry
about whether enrollment currently factored into recruiter
compensation, and whether that policy might have to change in
response to new regulations, Hamburger stated:

> Well, thanks for asking that because that gives me a
> great opportunity to clarify in case anybody thinks that
> we pay a bonus or an incentive payment to our admissions
> advisors. The answer is no, we don't. We pay a base
> salary. And we expect to continue to pay them a base
> salary; I don't think they're going to work for free.
>
> So no, we don't — we do not pay incentives or bonuses.
> And that's one of the things I think is so unfortunate
> about some of the reporting that's out there — again,
> based on anecdotes and stories and not based on facts.
> The fact is that incentive compensation is already
> banned, has been since 1992.
>
> And so, no, we don't — I mean, well, there could be
> changes; we may need to make changes in our evaluation
> processes, depending on the rules that are forthcoming,
> but it won't be like we're going from a situation where
> before, you were paying a commission and after, you're
> not, and you have to make this massive adjustment. That's
> not the case.

(Id. at ¶ 306; see also Q1 2011 DeVry Results Conf. Call, dated
October 26, 2010, attached as Ex. F to Saltpeter Decl., at 7.)  The
analyst then asked for further clarification:

> Q: But can you clarify the change in the salary?  Is it
> all impacted or has been [sic] by success in signing up
> students?  Is that something that impacts the change in
> salary?

A: Yes. We do a performance evaluation for admissions advisors just like we do for any other employee. And just like we do for any other employee, we look at the effectiveness of that person in their job. **And since a recruiter's job is to recruit, we certainly do take into account, did they recruit any students?** And that is a consideration, which is compliant with the statute and the regulations.

(Q1 2011 DeVry Results Conf. Call, dated October 26, 2010, at 8; see also Second Am. Compl. ¶ 307 (emphasis added).)  Hamburger sounded a similar note during a conference call with investors and analysts on January 25, 2011, after the DOE had announced that it was repealing the Safe Harbors effective July 2011:

Q: First question — how did your view for the second half incorporate any changes that you may be making related to the regulatory environment?  And can you give us an update on your thoughts around compensation structures for enrollment advisors?

A: Well, compensation structures for enrollment advisors are a base salary. And I want to be very clear that DeVry -- and when I say DeVry without University, that means DeVry, all of DeVry -- DeVry pays a base salary. That means all the schools of DeVry that are covered Title IV employees . . . .

But DeVry schools, like we're talking about here, pay a base salary to enrollment advisors and financial aid professionals. And so a lot of this talk about incentive compensation is — there's a lot of misunderstanding.  A lot of people think that suddenly incentive compensation is banned, and that's not the case. It's been banned since 1992. And so what the concern that many, many schools have around the compensation regulations — and of course, those apply to all schools, public sector, private sector like DeVry or independent schools, for that matter — is that it makes it very difficult to manage and it treats your base salary as though it were incentive compensation as well. So you can't do performance management of somebody even in their annual performance review, directly or indirectly, based on how they do their job. And we are very — many schools, all

schools, are concerned about the potential litigation risk that that could create for colleges and universities.

So those are the things we are concerned about in that area.

Q: So, are you planning for changes to your — recognizing that you are only paying base salaries, are you planning changes to the comp structure?

A: Nothing that you would be able to model or see. I mean, there's always management changes. **There are things that we're looking at in our performance management system.** We will certainly do everything we need to do to ensure that we are compliant, as we always strive to be, with all rules and laws, **but nothing that would be significant or that would affect your model.**

(Q2 2011 DeVry Results Conference Call, dated Jan. 25, 2011, attached as Ex. H to Saltpeter Decl., at 8 (emphasis added).)

The Funds argue that these statements were misleading in two respects. First, as we just discussed, the plaintiffs' CW's describe compensation practices that were <u>not</u> "compliant with the statute and the regulations." (Q1 2011 DeVry Results Conf. Call, dated October 26, 2010, at 8.) So, the Funds have sufficiently alleged that Hamburger made misleading statements about DeVry's compliance with the then-current regulations. Second, the Funds argue that Hamburger misled investors when he said that DeVry would not be making "significant" changes to its "performance management system." The Funds' CW's describe a system of incentive compensation that was based "solely" on the number of students enrolled. So, just on the face of the new regulations,

"significant" changes would be required to make DeVry's practices compliant. On that basis, we conclude that Hamburger's statement was misleading.

The Funds go further and allege that DeVry already had reason to believe that the changes would negatively impact student enrollment. Three CW's state that DeVry first announced changes to its compensation policy sometime in 2009, after the DOE announced that it was reconsidering the Safe Harbors. (See Second Am. Compl. ¶ 111 (CW 1 stating that changes were first announced in June 2009, to be "rolled out" in June 2010); see also id. at ¶ 112 (CW 4 stating that "at some point in 2009" DeVry "started to move away from" its old compensation policy); ¶ 113 (CW 5 stating that he/she "first heard about the possibility of" a new compensation policy "at the end of 2009").) CW 5 describes "pilot" programs implementing the changes in or around November 2010 at DeVry locations in Sherman Oaks, California, Naperville, Illinois, and Orlando, Florida. (See id. at ¶ 115.) He/she states that student enrollment fell at the test locations, but provides concrete information only about Orlando. (See id. (CW 5 stating that under the new policy enrollments at the Orlando campus fell from 6-7 per advisor per session to 1-2 per advisor per session); see also id. at ¶ 123 (CW 16 reporting second hand that "during the pilot programs for the new compensation plan, enrollments were cut by '50%'"); ¶ 129 (CW 20 stating that enrollment decreased by "at

least" 30% during the pilot program).) But the Funds do not allege that any of these CW's worked in Orlando, Florida. (See id. at ¶ 28 (alleging that CW 5 worked at DeVry's Naperville and Sherman Oaks offices); ¶ 39 (alleging that CW 16 worked for "DeVry Online" at an unspecified location and later moved to DeVry's headquarters in Illinois); ¶ 43 (alleging that CW 20 worked in Phoenix, Arizona).) CW 5 states that the information about Orlando was "well known throughout DeVry," (see id. at ¶ 115), but this is conclusory. Other witnesses describe declines in enrollment and attribute them to DeVry's new policy. Some of these allegations are vague,[6] and others describe events occurring after the defendants made the challenged statements. (See id. at ¶ 126 (describing events during the two-week session after April 2011), ¶ 128 (describing events after June 2011), ¶ 130 (after July 2011), ¶ 142 (after June 2011).) Moreover, no CW provides reliable information about the impact of the pilot programs on DeVry's overall enrollment.[7] In sum, we conclude that the Funds' allegations about DeVry's "pilot programs" are insufficient under the PSLRA to demonstrate the falsity of the defendants' class-period statements.

---

[6] (See, e.g., id. at ¶¶ 134-137 (CW 23 describing the impact of the new changes without identifying any time frame).)

[7] The Funds' allegations that the new compensation policy caused recruiters to leave DeVry suffer from the same problem. (See Second Am. Compl. ¶¶ 119, 127, 139, 143.) The CW's statements are anecdotal and do not provide a reliable basis for inferring a material, company-wide problem.

### 3. Whether the Funds Have Sufficiently Pled Scienter

The PSLRA provides that,

> in any private action arising under this chapter in which
> the plaintiff may recover money damages only on proof
> that the defendant acted with a particular state of mind,
> the complaint shall, with respect to each act or omission
> alleged to violate this chapter, state with particularity
> facts giving rise to a strong inference that the
> defendant acted with the required state of mind.

15 U.S.C.A. § 78u-4(b)(2)(A). "That 'required state of mind' is an
intent to deceive, demonstrated by knowledge of the statement's
falsity or reckless disregard of a substantial risk that the
statement is false." Higginbotham v. Baxter Intern., Inc., 495
F.3d 753, 756 (7th Cir. 2007). With respect to forward-looking
statements, the statute requires actual knowledge. See 15 U.S.C.A.
§ 78u-5(c)(1)(B). The inference of scienter is "strong" if a
reasonable person would deem the inference "cogent" and "at least
as compelling as any opposing inference one could draw from the
facts alleged." Tellabs, 551 U.S. at 324. We concluded in our
earlier opinion that Boca Raton had not satisfied this standard.
There was no evidence tying the individual defendants or any other
senior DeVry executive to the Fund's "predatory business model"
allegations. See Boca Raton, 2012 WL 1030474, *10-11. And the
diffuse nature of the alleged fraud did not lend itself to the
inference that the company's senior officers must have known what
was going on. See id. We suggested, however, that the Fund's

allegation that DeVry paid illegal bonuses might support such an inference. <u>See</u> <u>id.</u> ("[I]f DeVry paid recruiters 'variable bonuses' tied to enrollment, is it likely that the defendants did not know that when they *specifically* told investors otherwise?") (emphasis in original).

The Funds still have not alleged facts tying senior DeVry executives to their recruiter-compensation allegations. <u>See</u> <u>id.</u> at *11 ("There are no allegations linking Hamburger, Gunst, or any other senior DeVry executive to facts contradicting the company's statements about its recruiter-compensation policies."). CW 15 states that he/she participated in monthly conference calls about "corporate-level and/or system-wide issues" led by David Pauldine, DeVry's Executive Vice President. (Second Am. Compl. ¶¶ 25 n.3, 147.) CW 15 states that Hamburger "sometimes" participated in these calls, (<u>id.</u> at ¶ 147), but he/she does not describe what was discussed. CW 5 states that Hamburger and Pauldine participated in a meeting announcing the company's new compensation policy. (<u>See</u> <u>id.</u> at ¶ 117.) But CW 5 did not attend the meeting, and does not provide even second-hand information about what was discussed. He/she merely states that he/she spoke with unidentified "Directors" "who described how the new compensation policy was

'supported by corporate.'" (Id.)  These vague allegations add
little to the overall analysis.[8]

The primary thrust of the Funds' argument is that the
defendants must have known what was going on.  In asking us to draw
this inference, they rely heavily on our previous comments about
their illegal-bonus allegations.  See Boca Raton, 2012 WL 1030474,
*10-11.  As we discussed earlier in this opinion, the Funds have
been unable to adequately support those allegations.  We have held
that the Funds have adequately alleged falsity on other bases, see
supra, but those allegations do not lend themselves to a strong
inference that defendants must have known the truth.  The company
had an ostensibly HEA-compliant policy of "fixed compensation,"
(see, e.g., Second Am. Compl. ¶¶ 58, 68, 79-80), which tends to
support the inference that the defendants believed that their
class-period compliance statements were truthful.  See Tellabs, 551
U.S. at 324 (directing courts to weigh competing inferences from
the alleged facts).  The CW's state that the official policy was a
sham, but it is not clear how the individual defendants and other
senior executives would know that.  Even if the defendants reviewed
recruiter evaluations — and there are no allegations that they did

    [8] Similarly, we again conclude that the Funds' motive allegations do
little to bolster the inference of scienter.  Most of the relevant allegations
in the Second Amended Complaint are identical to the allegations that we
considered and rejected in our earlier decision.  See Boca Raton, 2012 WL
1030474, *12.  With respect to the new alleged facts regarding stock sales by
Gunst, (see Second Am. Compl. ¶¶ 353, 356), the plaintiffs have not meaningfully
responded to the defendants' arguments that they do not support a strong
inference of scienter.  (See Pls.' Resp. at 35.)

— an HEA violation would not be apparent on their face. The Safe Harbor gave institutions substantial leeway to base fixed compensation on enrollment success. The Funds' CW's emphasize that the TEACH values were subjective and malleable, (see, e.g., Second Am. Compl. ¶ 107), but this only underscores the fact that it was difficult to identify the line between permissible and non-permissible fixed compensation. See Program Integrity Issues, 75 Fed. Reg. at 34817 (acknowledging this problem and citing it as a reason for repealing the Safe Harbors). The inference of scienter is further undercut by the fact that the Funds' CW's do not allege a uniform practice. Some witnesses state that TEACH values were "fixed" to correspond to enrollment success. (See, e.g., Second Am. Compl. ¶ 73.) Other witnesses indicate that TEACH ratings were determined independently, but ignored. (See id. at ¶¶ 64, 94.) Institutional Investors Group v. Avaya, Inc., 564 F.3d 242 (3d Cir. 2009) is distinguishable. In that case, the Third Circuit concluded that it was unlikely that the defendant was unaware that his company had been awarding "massive" price discounts to its customers when he specifically and repeatedly denied that this was occurring. Id. at 269-73. The existence of "massive" price discounts directly affecting the company's bottom line is a readily verifiable fact; company-wide compliance with a nebulous legal standard ("not based *solely* on the number of students recruited") is not. For the same reason, the fact that student enrollment is

important to DeVry's business supports, at best, a very weak
inference that the defendants knew that the company was paying
illegal recruiter compensation. See Boca Raton, 2012 WL 1030474,
*11; (cf. Pls.' Resp. at 28-29). The inferential leap from the
issue's significance to the company to the particular fraud alleged
in this case is simply too great.

Arguably, Hamburger's statements to analysts in connection
with the new regulations were misleading even if he believed that
DeVry was complying with the Safe Harbor. In October 2010, he
stated that the company did not pay illegal bonuses in response to
a question about whether enrollment was a factor in recruiter
compensation. (See Q1 2011 DeVry Results Conf. Call, dated October
26, 2010, at 7.) When pressed for clarification, he conceded that
student enrollment *was* a factor. (See id. at 8.) But he did not
say how much it contributed to recruiter pay. During the
conference call discussing DeVry's results for the following
quarter, Hamburger was again asked how the changes to the
recruiter-compensation regulations would affect the company. (See
Q2 2011 DeVry Results Conference Call, dated Jan. 25, 2011, at 8.)
He stated that the company was considering changes to its
recruiter-compensation policy, but that the changes were "nothing
that would be significant or that would affect your [the analyst's]
model." (See id.) Hamburger's comments seem to suggest that
student enrollment played only a small role in recruiter

compensation, when in fact the Funds' CW's state that it played a significant role even under DeVry's *official* policy. (See Second Am. Compl. ¶ 68 ("CW 3 stated that the performance evaluation system was split, with 60% of the performance measured by numbers (leads, applications, starts) and 40% based on 'soft skills.'"); ¶ 79 ("CW 8 confirmed that performance reviews were based 60% on achieving quotas and 40% on TEACH values, which included teamwork, education, attitude, customer service, and willingness to help students.").)[9] However, there are several factors undermining the inference of scienter. First, we have already held that the plaintiffs' allegations about DeVry's unsuccessful "pilot" programs are deficient. See In re Career Educ. Corp., No. 03 C 8884, 2007 WL 1029092, *10 (N.D. Ill. Mar. 29, 2007) (insufficiently pled allegations do not contribute to the inference of scienter). So, there are no reliable allegations suggesting that Hamburger knew (or recklessly disregarded) facts indicating that the changes would significantly impact DeVry's bottom line. Second, Hamburger made all of the challenged statements months before the new regulations went into effect in July 2011. His last challenged statement on this subject prior to the effective date of the new regulations was more forthcoming:

---

[9]   The defendants criticize the Funds for failing to provide us with a "written recruiter compensation policy." (Defs.' Reply at 5.) We would be surprised, frankly, if the Funds could unearth such a document without the benefit of discovery. In any event, we believe that the Funds' CW's are reliable sources for the content of DeVry's official compensation policy. (See infra.)

> But we will be making some changes to our performance-
> management systems and processes in the areas that are
> covered under the Title IV regulations. And that could
> have some distractions for our folks. We do have people
> working on changes, so that certainly could be one of the
> factors that are included when I say [sic] internal
> factors earlier. But to this point, I would [sic] see
> that as a major driver, but it's a factor. And we'll
> just have to see where we go in the future.

(See Q3 2011 DeVry Results Conf. Call, dated April 26, 2011,

attached as Ex. I to Saltpeter Decl., at 8-9.) Ultimately, we

conclude that the complaint's allegations indicate only that

Hamburger's comments about the new regulations were evasive, and

that is not enough. See Plumbers and Pipefitters Local Union 719

Pension Fund v. Zimmer Holdings, Inc., 679 F.3d 952, 956 (7th Cir.

2012) ("The worst one could say about Zimmer's answer is that it

was evasive, which is short of fraudulent.").

**D.   Whether the Funds Have Sufficiently Alleged Loss Causation**

At the pleading stage, the plaintiff must "provide a defendant

with some indication of . . . the causal connection" between the

defendant's misstatement or omission and the plaintiff's loss.

Dura Pharmaceuticals, Inc. v. Broudo, 544 U.S. 336, 347 (2005). We

previously held that the Fund's loss-causation allegations were

deficient because Boca Raton failed to adequately allege that the

truth about DeVry's predatory practices ever emerged. See Boca

Raton, 2012 WL 1030474, *13-18. If DeVry's alleged misconduct was

not revealed, the "truth" could not have caused DeVry's stock price

to fall in August 2010. See id.; see also Transcontinental Indus.,

Ltd. v. PricewaterhouseCoopers, LLP, 475 F.3d 824, 842 (7th Cir. 2007) (affirming dismissal where the plaintiff did not sufficiently allege that the market learned what the defendants had allegedly concealed).  The Funds now allege that the truth about DeVry's illegal-compensation practices emerged in August 2011, when DeVry announced that new undergraduate enrollment fell by 25.6% at DeVry University.  (See Second Am. Compl. ¶ 338.)[10]  Among other factors contributing to the decline, Hamburger cited the need to comply with the new incentive-compensation regulations. (See Q4 2011 DeVry Results Conf. Call, attached as Ex. S to Saltpeter Decl., at 2-3.)

Neither DeVry's 10-K, nor Hamburger's statements to investors that same day, disclosed any violation of the HEA's incentive-compensation rules.[11]  Instead, the Funds argue that the new regulations caused DeVry to impose HEA-compliant policies "for the first time," (Second Am. Compl. ¶ 5), and therefore the impact of the new regulations implicitly revealed the illegality of DeVry's practices under the old regulations.  In the abstract, we tend to agree with the Funds that a plaintiff may comply with Dura without alleging a disclosure explicitly revealing the defendant's fraud. (See Pls.' Resp. at 39-40.)  But their disclosure theory in this

_____

[10]/  Enrollment at some DeVry schools increased during the same period. (See Press Release, dated Aug. 11, 2011, attached as Ex. A to Saltpeter Decl., at 1.)

[11]/  The Funds do not cite any other relevant disclosures — e.g., a DOE investigation directly implicating DeVry — that would have disclosed the alleged violations.

case is strained and inconsistent with <u>Transcontinental</u>. The plaintiffs in <u>Transcontinental</u> alleged that the defendant made material misrepresentations in a 1997 audit statement that induced the plaintiff to purchase stock in Anicom, Inc. <u>See Transcontinental</u>, 475 F.3d at 842. In 2000, Anicom's stock price fell after it disclosed misstatements in its 1998 and 1999 financial statements. <u>Id.</u> at 842-43. Our Court of Appeals held that Anicom's revelations concerning its 1998 and 1999 financial statements did not make the problems with the 1997 audit "generally known." <u>Id.</u> This was so despite the plaintiff's argument that the disclosed problems were part of the same "on-going scheme to overrepresent revenue and that the 1998 audit relied in part on historic information." <u>Id.</u> at 842. The Funds' theory in this case — that DeVry's violations of the old regulations are hidden within the company's revelations about the impact of the new regulations — is substantially similar. <u>Transcontinental</u> requires a more direct relationship between the alleged fraud and the disclosure revealing the fraud to the market. We conclude that the Funds have not adequately alleged loss causation.

**E.    The Fund's Control Person Claim (Count II)**

The Funds' control-person claim must be dismissed because they have failed to adequately allege a primary securities law violation. <u>See, e.g.</u>, <u>In re Allscripts, Inc. Securities Litigation</u>, No. 00 C 6796, 2001 WL 743411, *12 (N.D. Ill. June 29,

2001) ("If a Complaint does not adequately allege an underlying violation of the securities laws . . . the district court must dismiss the section 20(a) claim.").

## F.    Dismissal is With Prejudice

Boca Raton filed this lawsuit before conducting a proper pre-suit investigation. See <u>Boca Raton</u>, 2012 WL 1030474, *1. With the defendants' agreement, (see Joint Scheduling Stipulation, Dkt. 11), we gave Boca Raton 60 days to file an amended complaint attempting to comply with the PSLRA. It "used that time to conduct an investigation that it should have conducted before filing this lawsuit." See <u>Boca Raton</u>, 2012 WL 1030474, *1. However, its amended complaint failed to properly allege any of the elements of a Rule 10b-5 claim. See <u>id.</u> at *3-18. It then scrapped its theory of the case to emphasize disclosures that the defendants made *after* this lawsuit was filed. The Funds have lost money on their investments, but the securities laws do not insure against all such losses. See <u>Dura</u>, 544 U.S. at 347-48. The way that the plaintiffs and their attorneys have conducted this lawsuit — "shoot first, aim later," as the defendants aptly put it — indicates that insurance is what they are seeking. Under the circumstances, we do not believe that a fourth opportunity to state a securities-fraud claim is warranted. The Funds' complaint is dismissed with prejudice.

## G.    Sanctions

Under the PSLRA, "upon final adjudication of the action, the court shall include in the record specific findings regarding compliance by each party and each attorney representing any party with each requirement of Rule 11(b) of the Federal Rules of Civil Procedure as to any complaint, responsive pleading, or dispositive motion." 15 U.S.C. § 78u-4(c)(1); <u>see also</u> <u>City of Livonia Employees' Retirement System and Local 295/Local 851 v. Boeing Co.</u>, — F.3d —, 2013 WL 1197791, *7-8 (7th Cir. Mar. 26, 2013) (slip op.). If the court concludes that there has been a Rule 11 violation, then it must impose sanctions on the party or attorney who violated the rule. <u>Id.</u> at § 78u-4(c)(2). The defendants have asked us to impose sanctions against the plaintiffs. (<u>See</u> Defs.' Mem. at 45-46.) We will give the plaintiffs an opportunity to address the defendants' arguments before making our findings under § 78u-4(c)(1).

## CONCLUSION

The defendants' motion to dismiss and to strike [83] is granted in part and denied in part. The motion to strike is denied. The motion to dismiss is granted. The Funds' Second Amended Complaint is dismissed with prejudice. The Funds shall file a memorandum addressing the defendants' request for sanctions by April 26, 2013. The defendants shall respond to the plaintiffs' memorandum by May 17, 2013. The court will then take the matter under advisement.

DATE:        March 27, 2013

ENTER:

John F. Grady, United States District Judge