**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

<table>
<tr><td>
BOCA RATON FIREFIGHTERS' AND<br>
POLICE PENSION FUND and WEST<br>
PALM BEACH FIREFIGHTERS PENSION<br>
FUND, individually and on behalf<br>
of all others similarly situated,<br>
<br>
                Plaintiffs,<br>
<br>
                v.<br>
<br>
DEVRY INC., DANIEL HAMBURGER, and<br>
RICHARD M. GUNST,<br>
<br>
                Defendants.
</td>
<td>
)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)
</td>
<td>
<br><br><br><br><br><br><br><br><br>No. 10 C 7031
</td>
</tr>
</table>

**MEMORANDUM OPINION**

The court makes the following findings pursuant to the Private Securities Litigation Reform Act ("PSLRA"), 15 U.S.C. § 78u-4.

**BACKGROUND**

We will assume that the reader is familiar with our opinions dismissing Boca Raton Firefighters' and Police Pension Fund's ("Boca Raton") first amended complaint ("FAC") and second amended complaint ("SAC").  See Boca Raton Firefighters' and Police Pension Fund v. DeVry Inc., No. 10 C 7031, 2012 WL 1030474 (N.D. Ill. Mar. 27, 2012) ("Boca Raton I"); Boca Raton Firefighters' and Police Pension Fund v. DeVry Inc., No. 10 C 7031, 2013 WL 1286700 (N.D. Ill. Mar. 27, 2013) ("Boca Raton II").  Nevertheless, it will be helpful to briefly discuss this lawsuit's procedural history.  On November 1, 2010, Robbins Geller Rudman & Dowd LLP ("Robbins

Geller"), as counsel for Boca Raton, filed its original securities-fraud complaint against Devry, Inc., Daniel Hamburger, Richard M. Gunst, and David Pauldine. The parties filed a joint scheduling stipulation before their first court appearance. The stipulation, which we entered, allowed Boca Raton to file a "consolidated complaint" 60 days after an order designating it as "lead plaintiff." (See Order re Joint Scheduling Stip., Dkt. 18.) The defendants would then have 60 days to answer the "consolidated complaint," or if the plaintiffs did not file one, 60 days to answer the original complaint. (Id.) On January 3, 2011, Boca Raton moved for an order designating it as lead plaintiff, Robbins Geller as lead counsel, and Wexler Wallace LLP as liaison counsel. We granted that motion without any objection from the defendants. At the hearing on the motion, defense counsel inquired whether Boca Raton intended to file an amended complaint. (See Trans. of Hearing, dated Jan. 5, 2011, Dkt. 28, at 5.) Plaintiff's counsel, David J. George, responded that he intended to amend the complaint and requested 60 days to do so (consistent with the scheduling stipulation). (Id.) We asked counsel why he needed such a long time, and he explained that Boca Raton's fact investigation was "ongoing" and that it needed to bolster the complaint's allegations to satisfy the PSLRA's heightened pleading requirements. (Id. at 5-6.) We then asked counsel whether he believed that his current complaint satisfied the PSLRA:

The Court: You think your present complaint is insufficient to pass muster?

Mr. George: Your Honor, from -- yes. The complaint as it stands now would not be one that I would stand on under the standards under the Private Securities Litigation Reform Act, and as a matter of pattern and practice in these cases, once lead plaintiff is appointed, because up until this point there has not been one, a new complaint is filed that incorporates all of the materials that we gathered in the course of the factual investigation. And, in fact, 60 days — they have actually agreed to it — it's a reasonable and customary amount of time in these cases.

(Id. at 6.) So, without objection from the defendants, we gave Boca Raton 60 days to file an amended complaint, and gave the defendants 60 days to answer or otherwise plead:

THE COURT: Well, then, Mr. Salpeter, I think you can assume that there will be an amended complaint, so you should hold your fire until you see what it looks like.

MR. SALPETER: I agree. So I guess the order that your Honor previously put into effect where they get 60 days to amend their complaint and then we get 60 days thereafter to attack the complaint stands. Is that fair?

THE COURT: Do you think you will need 60?

MR. SALPETER: I'd like 60.

THE COURT: All right. We will let that stand.

MR. SALPETER: Okay.

(Id. at 7.)

Boca Raton filed its amended complaint, entitled "Consolidated Class Action Complaint,"[1] on March 7, 2011, (See FAC, Dkt. 27.) The FAC did not name Pauldine as a defendant, but in a footnote

---

[1] The PSLRA contemplates consolidated class actions, see 15 U.S.C. § 78u-4(a)(3)(B)(ii), but no other actions were consolidated with this case.

Boca Raton continued to allege that he had engaged in insider trading. (See id. at ¶ 41, n.1.)  Many of the FAC's allegations were based upon counsel's interviews with confidential witnesses (students and DeVry employees).  (See id. at ¶¶ 38-72.)  The thrust of the FAC was that Devry had a "predatory" business model that put profits ahead of education[2] — a curious basis for a securities-fraud lawsuit.  The FAC contained many loosely related anecdotes from students and front-line employees at Devry's various campuses.[3]  We concluded that these allegations did not support an inference of widespread fraud impugning the company's positive statements concerning its operations during the class period.  The FAC's strongest (but still deficient) allegations concerned Devry's recruiter-compensation practices.  The Higher Education Act ("HEA") prohibits schools from providing "any commission, bonus, or other incentive payment based directly or indirectly on success in securing enrollments or financial aid to any persons or entities engaged in any student recruiting or admission activities or in making decisions regarding the award of student financial assistance."  20 U.S.C. § 1094(20).  But for most of the class

---

[2]  (See, e.g., FAC at ¶ 3 (Alleging that DeVry created "a systemically predatory business model designed for one purpose and one purpose alone — to identify, target and exploit 'sales leads' (or students, as they are referred to by most institutions of higher learning) in order to close as many 'sales' (or student enrollments, as they are referred to by most institutions of higher learning) as possible and then use its students to effectuate a cash grab by cannibalizing federal student financial aid monies.").)

[3]  A statement attributed to "CW 20" gives a flavor of those allegations: "I took a lower paying job because I couldn't stay at a job that was evil. DeVry was the most evil place I ever worked."  (FAC at ¶ 122.)

period, the regulation implementing this restriction contained a "safe harbor" that gave schools substantial leeway to reward recruiters for enrolling students:

> (b)  By entering into a program participation agreement, an institution agrees that —
>
> (22)(i) It will not provide any commission, bonus, or other incentive payment based directly or indirectly upon success in securing enrollments or financial aid to any person or entity engaged in any student recruiting or admission activities . . . .
>
> (ii) Activities and arrangements that an institution may carry out without violating the provisions of paragraph (b)(22)(i) of this section include, but are not limited to:
>
> (A) The payment of **fixed compensation**, such as a fixed annual salary or a fixed hourly wage, as long as that compensation is not adjusted up or down more than twice during any twelve month period, and any adjustment is not based **solely** on the number of students recruited, admitted, enrolled, or awarded financial aid. For this purpose, an increase in fixed compensation resulting from a cost of living increase that is paid to all or substantially all full-time employees is not considered an adjustment.

34 C.F.R. § 668.14(b)(22) (effective until July 1, 2011) (emphasis added).  One confidential witness alleged that he/she received a "variable bonus" tied to enrollment success, a clear HEA violation. (See FAC at ¶ 169.)  But we concluded that this allegation, supported by only one confidential witness, was insufficient to establish that the defendants' class-period statements were false. See Boca Raton I, 2012 WL 1030474, *7.  Boca Raton's scienter allegations were also deficient.  None of the plaintiff's confidential witnesses held positions within the company that would

have enabled them to make allegations about what DeVry's senior
executives knew about the company's practices. See id. at *10-12.
We noted that the nature of the recruiter-compensation allegations
might support an inference that the defendants must have known
about the alleged HEA violations. See id. at *11 ("[I]f DeVry paid
recruiters 'variable bonuses' tied to enrollment, is it likely that
the defendants did not know that when they specifically told
investors otherwise?"). But again, those allegations were
insufficient to support the allegation that the defendants had
misrepresented their recruiter-compensation policy. See id. ("[W]e
have already held that the plaintiffs have not sufficiently alleged
that [the defendants' compliance statements] were false. Therefore,
it is unnecessary to decide now whether the plaintiffs could plead
scienter as to those alleged misrepresentations."). Finally, we
held that the plaintiff had not sufficiently alleged loss
causation. Boca Raton relied upon public documents that criticized
the for-profit education industry in general, but did not accuse
DeVry of any wrongdoing. See id. at *13-18; cf. Tricontinental
Indus., Ltd. v. PricewaterhouseCoopers, LLP, 475 F.3d 824, 843 (7th
Cir. 2007). Moreover, none of the documents that the plaintiffs
cited mentioned recruiter compensation (at DeVry or elsewhere).
See Boca Raton I, 2012 WL 1030474, *19 ("[T]he Fund has not
identified any disclosure even touching upon recruiter
compensation, the complaint's strongest (although still deficient)

allegations."). So, the market never learned what the defendants had allegedly concealed. We gave Boca Raton leave to amend its complaint, but noted that it faced an "uphill climb." Id.

Boca Raton completely overhauled its theory of the case in the SAC. Instead of attacking DeVry's entire business model, the SAC focused narrowly on the company's allegedly illegal recruiter-compensation policy. See Boca Raton II, 2013 WL 1286700, *2. Boca Raton alleged that the market learned about DeVry's illegal practices in August 2011 — approximately 10 months after it filed its original complaint. See id. The defendants moved to dismiss, arguing — among other things — that Boca Raton lacked standing to challenge statements that the defendants made after Boca Raton last purchased DeVry stock. See id. We gave Boca Raton leave to amend the complaint to add a co-plaintiff (West Palm Beach Firefighters' Pension Fund) that had purchased stock after the last allegedly false statement alleged in the SAC. See id. This cured the standing problem, but still, the SAC failed to satisfy the PSLRA's heightened pleading requirements. The plaintiffs sufficiently alleged that the defendants made several false statements during the class period, see id. at *5-6, but they did not sufficiently allege that the defendants made those statements with the required state of mind. See id. at *9-12. Also, Boca Raton's new loss-causation theory was deficient. Effective July 1, 2011, the Department of Education ("DOE") repealed the recruiter-compensation

"safe harbor," making it illegal to base compensation, in any part, on enrollment success. <u>See</u> 34 CFR § 668.14 (b)(22). In August 2011, Devry announced that new undergraduate employment fell at Devry University, and Hamburger attributed the decline to the need to comply with the new recruiter-compensation regulations (among other things). According to the plaintiffs, "the new regulations caused DeVry to impose HEA-compliant policies 'for the first time,' [SAC at ¶ 5], and therefore the impact of the new regulations implicitly revealed the illegality of DeVry's practices under the old regulations." <u>Id.</u> at *12. We held that this strained theory did not allege a sufficiently clear connection between the alleged fraud and the defendants' disclosure. <u>Id.</u> Because the plaintiff had failed to sufficiently allege scienter and loss causation, we dismissed the complaint, this time with prejudice. <u>Id.</u> at *13.

## DISCUSSION

### A.   Legal Standard

The PSLRA requires a court, "upon final adjudication of the action," to make "specific findings regarding the compliance by each party and each attorney representing any party with each requirement of Rule 11(b) of the Federal Rules of Civil Procedure as to any complaint, responsive pleading, or dispositive motion." 15 U.S.C. § 78u-4(c)(1); <u>see also</u> <u>City of Livonia Employees' Retirement System and Local 295/Local 851 v. Boeing Co.</u>, 711 F.3d 754, 761 (7th Cir. 2013) (the district court has a "duty" to make

the findings required by § 78u-4(c)(1) whether or not the prevailing party asks for sanctions). Because § 78u-4 applies to "any" complaint, "when a plaintiff files multiple complaints, each must be scrutinized." Thompson v. RelationServe Media, Inc., 610 F.3d 628, 664 (11th Cir. 2010). "The PSLRA does not grant a get-out-of-jail-free card — one nonfrivolous complaint does not immunize the earlier filing of frivolous complaints." Id. If we conclude that any party and/or attorney has violated any requirement of Rule 11(b), we must impose sanctions. See 15 U.S.C. § 78u-4 (c)(2) ("Mandatory sanctions"). The presumed sanction for the "substantial failure of any complaint" to comply with Rule 11(b) is "an award to the opposing party of the reasonable attorneys' fees and other expenses incurred **in the action**." Id. at § 78u-4(3)(A) (emphasis added). The party opposing sanctions may rebut this presumption only upon proof that (1) "the award of attorneys' fees and other expenses will impose an unreasonable burden on that party or attorney and would be unjust, and the failure to make such an award would not impose a greater burden on the party in whose favor sanctions are to be imposed;" or (2) "the violation of Rule 11(b) of the Federal Rules of Civil Procedure was de minimis." Id. at § 78u-4(3)(B) (i) and (ii). If the opposing party successfully rebuts the presumption, then the court "shall award the sanctions that the court deems appropriate pursuant to Rule 11 of the Federal Rules of Civil Procedure." Id. at § 78u-4(3)(C).

"Representations in a filing in a federal district court that are not grounded in an 'inquiry reasonable under the circumstances' or that are unlikely to 'have evidentiary support after a reasonable opportunity for further investigation or discovery' violate Rules 11(b) and 11(b)(3).'" Boeing, 711 F.3d at 762. "[A] court may impose sanctions on a party for making arguments or filing claims that are frivolous, legally unreasonable, without factual foundation, or asserted for an improper purpose. In particular, a frivolous argument or claim is one that is "'baseless and made without a reasonable and competent inquiry.'" Fries v. Helsper, 146 F.3d 452, 458 (7th Cir. 1998) (quoting Townsend v. Holman Consulting Corp., 929 F.2d 1358, 1362 (9th Cir.1990) (en banc)).

## B.  Boca Raton's Original Complaint

We previously expressed our view that Boca Raton filed its original complaint without conducting a reasonable pre-suit inquiry. See Boca Raton I, 2012 WL 1030474, *1; Boca Raton II, 2013 WL 1286700, *13. The attorneys responsible for Boca Raton's investigation, Mr. George and Robert J. Robbins, state that they reviewed publically available information about DeVry, and about the for-profit education industry in general, before filing the complaint. (See George Decl., attached as Ex. 1 to Pl.'s Resp., ¶ 7 (a)-(v); Robbins Decl., attached as Ex. 2 to Pl.'s Resp., ¶ 5(a)-(v).) These declarations only establish that Mr. George and Mr.

Robbins conducted a pre-suit investigation, not that it was "reasonable under the circumstances." <u>Cf.</u> Fed. R. Civ. P. 11(b).[4] The section of the original complaint entitled "Defendants' False and Misleading Statements Issued During the Class Period" mostly consists of statements regarding DeVry's financial performance. (<u>See</u> Orig. Compl. ¶¶ 26, 28, 29-33, 36, 38, 40-42, 44-46, 48, 51, 57, 69.) Boca Raton did not allege in its original complaint, nor did it ever allege in any of its subsequent filings, that the defendants misstated its financial results. Setting these apparently truthful statements aside, the original complaint alleged only two conceivably actionable public statements.

*First*, in May 2008, Hamburger reassured investors in a press release that the company complied with recruiter-compensation regulations:

> "'As part of our long-standing commitment to quality and integrity, we believe that DeVry's recruiter compensation is structured in accordance with all governing rules and regulations,'" said Daniel Hamburger, president and chief executive officer of DeVry."

(Orig. Compl. ¶ 34.) We infer from Mr. George's and Mr. Robbins's declarations that they believed that this statement was false based upon: (1) a *qui tam* suit was filed by a DeVry employee who allegedly worked for the company between January 2002 and November 2003, approximately *four years* before the start of the class period

---

[4] Boca Raton retained an expert to state that Robbins Geller did conduct a reasonable pre-suit investigation. (<u>See</u> Decl. of Geoffrey C. Hazard, Jr., attached as Ex. 3 to Pl.'s Resp., ¶ 9.) For the reasons we are about to explain, we disagree with that assessment.

in this case; and (2) another *qui tam* action filed against a *different* for-profit education company. (See George Decl. ¶ 7(r) & (s); Robbins Decl. ¶ 5(r) & (s).) According to counsel, the latter is relevant here because the suit "included a reference to Dean Dunbar, who formerly worked in DeVry University's student enrollments program." (See George Decl. ¶ 7(r) & (s).) This is a flimsy basis to accuse the defendants of defrauding investors. At best, these lawsuits suggest a potential avenue for further investigation. But according Mr. George and Mr. Robbins, they did not speak with any witnesses before filing the original complaint. (See George Decl. ¶ 7 (a)-(v); Robbins Decl. ¶ 5(a)-(v).) That investigation only occurred after Boca Raton filed suit.

*Second*, in April 2010, Hamburger made the following statement shortly before DeVry's common stock reached its class-period high:

> "We continue to achieve favorable enrollment trends during this quarter, as students were attracted by the value proposition of our educational offerings, which includes high quality programs and services and a strong track record of academic outcomes for students . . . . We remain committed to investing in quality and providing the access and capacity we needed to educate our country's workforce to compete in the midst of a tough economy."

(Orig. Compl. ¶ 55.) Our best guess is that the plaintiffs believed that this statement was false because it did not disclose that DeVry "had engaged in improper and deceptive recruiting and financial aid lending practices . . . ." (Id. at ¶ 74(a).) But the complaint does not describe any "improper and deceptive"

practices. (Id.; see also id. at ¶ 74(b) (generically alleging that DeVry "failed to maintain proper internal controls").) This is not merely a technical pleading error. During the course of this lawsuit, we reviewed many of the public documents that counsel say they reviewed before filing suit. Those materials do not establish a reasonable basis to accuse DeVry of "improper and deceptive" practices. Although we did not scour the company's public filings, we presume that it did not accuse itself of wrongdoing in its own SEC filings and press releases. (See George Decl. ¶ 7(a), (b), (c), and (d).) Other materials describe problems in the for-profit education industry generally, but not at DeVry specifically. (See id. at ¶ 7(g), (h), (i), (j), (k), (l), (m), (n), (o), (p), (q), (u), (v).) This leaves categories of documents — e.g., "news, media reports and Internet searches," (id. at ¶ 7(e)) — that are too generic to support the conclusion that Boca Raton had a good faith basis for accusing DeVry of misrepresentation. (See also id. at ¶ 7(f) ("market analyst reports"); (t) ("complaints regarding DeVry University posted on the website, www.complaintsboard.com").)

The original complaint's allegations with respect to the other elements of a securities-fraud claim are perfunctory. The scienter allegations are cursory and circular:

> As set forth elsewhere in detail, defendants, by virtue
> of their receipt of information reflecting the true facts
> regarding DeVry, their control over, and /or receipt
> and/or modification of DeVry allegedly materially

> misleading misstatements and/or their associations with
> the Company which made them privy to confidential
> proprietary information concerning DeVry, participated in
> the fraudulent scheme alleged herein.

(Orig. Compl. ¶ 76.)   There is no "detail" elsewhere in the complaint that would give these allegations any hope of satisfying the PSLRA.   The original complaint's loss-causation allegations fare no better.   Boca Raton alleged that the "truth" about Devry was revealed on August 13, 2010 when the DOE released data showing that "loan repayment rates at DeVry's schools were just 38%." (Id. at ¶ 77.)   The thrust of this allegation was that, based upon the 38% repayment rate, DeVry might lose financial-aid eligibility *in the future* based upon proposed regulations *that had not yet gone into effect*. (See Orig. Compl. ¶ 72); see also Boca Raton I, 2012 WL 1030474, *18.   Moreover, the DOE data revealed nothing about DeVry's (or any other company's) compliance with recruiter-compensation regulations.

Boca Raton argues that it would be inappropriate to impose sanctions based upon Mr. George's statement at the January 5, 2011 status conference.   According to Mr. George, his statement was "poorly phrased and created an impression that was never intended." (See George Decl. ¶ 17.)   We rather think that Mr. George candidly acknowledged what was obvious on the face of the complaint: no reasonable lawyer could believe that the original complaint satisfied the PSLRA.   In any event, counsel is not being sanctioned for anything he said in open court.   Rule 11 sanctions are

appropriate because the original complaint was frivolous.  In sum, Boca Raton filed the original complaint without conducting a reasonable pre-suit inquiry, its securities-fraud claim was not warranted by existing law, and its factual contentions lacked evidentiary support.  The court finds that Boca Raton and Robbins Geller violated Rule 11(b).

## C.   Boca Raton's FAC

The FAC contained allegations based, in part, on counsel's interviews with 33 confidential witnesses.  See Boca Raton I, 2012 WL 1030474, *1 (After filing its original complaint, Boca Raton "conduct[ed] an investigation that it should have conducted before filing this lawsuit.").  Many of the statements in the amended complaint attributed to confidential witnesses were irrelevant, vague, and/or ambiguous.  (See id. at *3-4.)  But Boca Raton did find a confidential witness who supported its allegation that DeVry did not comply with recruiter-compensation regulations.  (See id. at *6-7 ("CW 20" alleged that he/she received a "variable bonus" tied to student enrollment).)  We held that this uncorroborated statement from a single confidential witness was insufficient to allege that the defendants had misrepresented their compliance with HEA regulations.  (Id.)  But the level of corroboration needed to state a claim under PSLRA using confidential witnesses is not set in stone.  See Makor Issues & Rights, Ltd. v. Tellabs Inc., 513 F.3d 702, 711-12 (7th Cir. 2008); Higginbotham v. Baxter Int'l

Inc., 495 F.3d 753, 757 (7th Cir. 2007). This allegation, although deficient, was not frivolous. The defendants complain that Boca Raton's attorneys have refused to divulge the names of the confidential witnesses, and have not given the court any information substantiating their reliance on the witnesses' statements. As the defendants point out, Robbins Geller has been admonished for its practices concerning confidential witnesses in other cases. See Boeing, 711 F.3d at 761-62 (criticizing the firm's conduct and citing other cases where it has been reprimanded). But we have no basis to suspect that the witnesses in this particular case did not make the statements attributed to them, or that plaintiff's counsel had reasons to suspect their trustworthiness. We will not require an investigation based only on speculation that it *might* produce evidence relevant to our Rule 11 inquiry.

We considered it a "close call" whether Boca Raton had adequately alleged that the defendants' HEA compliance statements were false. Boca Raton I, 2012 WL 1030474, *7. But falsity is only one element of a securities-fraud claim. At the pleading stage, the plaintiff must also "provide a defendant with some indication of . . . the causal connection" between the defendant's misstatement or omission and the plaintiff's loss. Dura Pharmaceuticals, Inc. v. Broudo, 544 U.S. 336, 347 (2005). Boca Raton alleged that the market learned about Devry's "predatory"

practices in a series of partial disclosures about the for-profit education industry *in general*. We held that this theory was inconsistent with our Court of Appeals's ruling in <u>Tricontinental</u>. <u>See</u> <u>Boca Raton I</u>, 2012 WL 1030474, *13-18. The plaintiffs in <u>Tricontinental</u> alleged that the defendant made material misrepresentations in a 1997 audit statement that induced the plaintiff to purchase stock in Anicom, Inc. <u>Tricontinental</u>, 475 F.3d at 842. In 2000, Anicom's stock price fell after it disclosed misstatements in its 1998 and 1999 financial statements. <u>Id.</u> at 842-43. The district court dismissed the plaintiffs' complaint because Anicom's disclosures about the 1998 and 1999 financial statements did not disclose problems with the 1997 statements. <u>Id.</u> at 842. On appeal, the plaintiffs argued that "[n]owhere in <u>Dura</u> does the Supreme Court require that the precise fraud that resulted in the underlying transaction be the subject of a later corrective disclosure in order to satisfy loss causation." <u>Id.</u> at 843. Our Court of Appeals rejected this argument and affirmed dismissal. <u>See</u> <u>id.</u> ("We cannot accept this rendition of Dura 's requirements."). Anicom's revelations concerning its 1998 and 1999 financial statements did not make the problems with the 1997 audit "generally known," (<u>id.</u>), notwithstanding the plaintiffs' argument that the disclosed problems were part of the same "on-going scheme to overrepresent revenue and that the 1998 audit relied in part on historic information." <u>Id.</u> at 842.

In light of <u>Tricontinental</u>, the FAC's loss-causation allegations cross the line between merely flawed and outright frivolous. <u>Tricontinental</u> is controlling authority in this district and the defendants cited it in their opening brief. In response, Boca Raton did not attempt to distinguish — did not even cite — <u>Tricontinental</u>. <u>See</u> <u>Gross v. Town of Cicero, Ill.</u>, 619 F.3d 697, 703 (7th Cir. 2010) ("Failing to cite adverse controlling authority makes an argument frivolous. Not only that, but it is imprudent and unprofessional."). Instead, it relied on non-binding authority from this district and from other jurisdictions to attempt to establish a more liberal interpretation of the pleading standard announced in <u>Dura</u>. Not only did <u>Transcontinental</u> explicitly reject the interpretation that Boca Raton advocated, it did so in a case alleging a much more plausible loss-causation theory. Anicom disclosed misstatements in its financial statements for 1998 and 1999, and the plaintiff alleged that those misstatements were part of an on-going scheme that included the company's 1997 financial statements. Nevertheless, our Court of Appeals held that the link between the 1997 financial statements, on the one hand, and the 1998 and 1999 statements on the other, was too tenuous to adequately plead loss causation. Given <u>Tricontinental</u>'s holding, it was unreasonable to argue that disclosures about other schools, and about the industry in general, disclosed fraud by DeVry.

Boca Raton's frivolous loss-causation theory should also be viewed within the context of the lawsuit as a whole. Boca Raton had no reasonable basis to accuse the defendants of securities fraud when it originally filed suit. After the fact, it attempted to "reverse engineer" a securities-fraud claim, to borrow the defendants' phrase. Its belated investigation produced a hodgepodge of anecdotal allegations without any plausible link to the defendants' public statements and/or the fund's losses. Essentially, the FAC prolonged a strike suit. We conclude that the amended complaint, like the original complaint, violated Rule 11(b).

**D.  Boca Raton's SAC**

Boca Raton's revamped SAC was stronger than its first two complaints. It was unable to bolster its allegation that the defendants paid illegal bonuses based upon enrollment success. <u>Cf.</u> <u>Boca Raton II</u>, 2013 WL 1286700, *4. But it adequately alleged that, in practice, the company's facially compliant fixed-compensation policy violated HEA regulations. The company purported to pay fixed compensation based upon enrollment and so-called "TEACH" values. Boca Raton alleged that, in fact, the TEACH values were pretextual and that fixed compensation was based "solely" on enrollment. <u>Id.</u> at *5-6. The plaintiffs also alleged that the defendants made misleading statements about the likely impact of new regulations. <u>Id.</u> at *6-8. We held that these

allegations did not satisfy the PSLRA, but they were not frivolous.
Likewise, Boca Raton made a non-frivolous argument that senior
DeVry executives must have known that the true facts belied their
confident statements about the company's compliance with HEA
regulations. Id. at *9-12.

Boca Raton's loss-causation allegations are a somewhat closer
call. In August 2011, the company disclosed that enrollment was
down at DeVry University — one of several schools owned and
operated by DeVry, Inc.[5] — and that the company attributed the
decline, in part, to the new recruiter-compensation regulations.
See id. at *12.[6] Boca Raton's theory that this disclosed DeVry's
violations of the old regulations, while less far-fetched than its
earlier theory, is still clearly inconsistent with Tricontinental.
See id. On the other hand, the case would look different if we had
held that the Boca Raton's non-frivolous allegations about the
impact of the new regulations had satisfied the PSLRA. (See
supra.) According to Boca Raton's confidential witnesses, DeVry
established pilot programs applying new recruiting policies that

---

[5]/ When the defendants pointed out that enrollment figures pertained to
DeVry University, and not DeVry, Inc. as a whole, the plaintiffs narrowed their
claim in their reply brief. (See Defs.' Resp. at 3 n.5.)

[6]/ The fact that the alleged disclosure occurred long after the original
complaint was filed tends to underscore the fact that Boca Raton was, all along,
groping in the dark for a theory that would permit it to recover its losses under
the securities laws. But we gave Boca Raton an opportunity to amend its
complaint, and it endeavored to tailor its claims to address the strengths and
weaknesses we had identified in the FAC. So, we disagree with the defendants'
argument that Rule 11 required Boca Raton to abandon the lawsuit after Boca Raton
I. (Cf. Defs.' Mem. at 14.)

complied with the proposed regulations. _Id._ at *8. Those witnesses stated that student enrollment fell significantly at schools that applied the new policies. _Id._ We held that the witnesses' statements were too vague and confusing to satisfy the PSLRA, _see id._, but the allegations based upon those statements were not frivolous. On that theory of the case, Boca Raton's loss-causation allegations have arguable merit. Hamburger publically downplayed the anticipated impact of the new regulations on the company. _See_ _id._ at *7-8. Arguably, that risk — decreased enrollment under the new regulations — materialized in August 2011 when the company announced that student enrollment had dropped 25.6% at DeVry University. _See_ _id._ at *12. This is purely hypothetical because Boca Raton did not adequately allege that Hamburger's statements were false. Nevertheless, it tends to show that the SAC, although unsuccessful, was not frivolous.

The defendants have also raised several specific objections to the SAC, which we address below.

### 1. The Effective Date of the New Incentive-Compensation Regulations

The defendants argue that Boca Raton strategically avoided alleging that the new incentive-compensation regulations became effective on July 1, 2011. The purpose of this deception, according to the defendants, was to create the impression that the defendants quietly changed their illegal compensation policies in response to increased regulatory scrutiny and not to comply with

the new regulations.  There is really only one allegation in the
complaint that arguably supports the defendants' interpretation:

> As the Class Period progressed, the Company, unbeknownst
> to the market and while under the pressure of the federal
> government's increased scrutiny of its business
> practices, fundamentally changed its compensation
> practices. Starting with a partial roll-out in 2010, the
> Company switched to a non-enrollment-based compensation
> framework. By eliminating any and all illegal incentive
> compensation tied to enrollments, the Company, for the
> first time during the Class Period, became compliant with
> the HEA.

(See SAC ¶ 5.)  This allegation could be read to suggest that it
was always illegal to base compensation on enrollment, even in
part.  This was not true for most of the class period.  But as a
whole, we think it is reasonably clear from the SAC that there were
two relevant regulatory standards.  The SAC alleged that DeVry paid
"fixed compensation" based "solely" on enrollment success, taking
the company's policy outside the "safe harbor" that was in effect
for most of the class period.  That allegation, accepted as true,
made the defendants' compliance statements false.  It also
undermined the defendants' optimistic predictions about the impact
of the new regulations.  DeVry was not simply eliminating one
factor (enrollment) from a multi-factor fixed-compensation policy.
It was completely reversing its policy.  Cf. Boca Raton II, 2013 WL
1286700, *11 (Hamburger told analysts that the company was
considering changes to its compensation policy, but that the
changes "were nothing that would be significant or that would

affect your model."). In short, we do not believe that Boca Raton attempted to deceive the court.

**2. Robbins Geller's Failure to Name a Proper Plaintiff**

The SAC challenged statements that the defendants made after the last date on which Boca Raton purchased stock. After the defendants pointed out that Boca Raton lacked standing to challenge those statements, Robbins Geller amended the SAC to add West Palm Beach Firefighters' Pension Fund as co-plaintiff. Boca Raton should have identified the issue before it filed the SAC, but it promptly addressed the problem when it was called to its attention. Its error was harmless.

**3. Allegations Against Gunst and Pauldine**

In their sanctions brief, the defendants argued that "Gunst was never alleged to have made any untrue statement." (See Defs.' Brief at 18-19.) This statement was untrue, and they withdrew it before the plaintiffs filed their response. (See Defs.' Errata Sheet at 2.) They stand on their argument that Boca Raton's allegations against Pauldine were groundless. As we discussed before, the original complaint naming Pauldine as a defendant was frivolous in its entirety. Boca Raton dropped Pauldine as a defendant in the FAC, but continued to allege that he had engaged in insider trading. (See FAC at ¶ 41 n.1; see also SAC at ¶ 25 n.3.) Boca Raton weakly argues that the allegation was appropriate because it is undisputed that Pauldine sold stock during the class

period, and this type of evidence is sometimes used to support scienter allegations.  (See Pl.'s Resp. at 19.)   But there is no basis for Boca Raton's allegation that the stock sales constituted "insider trading."  On the other hand, this stray allegation was confined to a footnote in the FAC and SAC, and by that time Pauldine was already out of the case.  If the defendants believed that the allegation damaged Mr. Pauldine's reputation, they could have filed a motion to strike.  We conclude that this allegation, while groundless, is not an independent Rule 11(b) violation.

## **CONCLUSION**

Robbins Geller ultimately filed a securities-fraud complaint with arguable merit.  But that does not excuse its prior frivolous complaints.   We conclude that Robbins Geller and Boca Raton violated Rule 11(b).  This triggers the presumption under 15 U.S.C. § 78u-4(3)(A) that the defendants are entitled to their reasonable attorneys' fees and other expenses for the entire action.  Whether the plaintiff and counsel can rebut that presumption will depend, in part, on the amount of the defendants' fees.  See id. at § 78u-4(3)(B)(i) (the party opposing sanctions may rebut the presumption by showing that the award of attorneys' fees and other expenses would impose an unreasonable burden).  So, by May 30, 2014, the defendants shall submit a fee petition, with billing records, establishing their fees for the entire action.  By June 20, 2014, Boca Raton and Robbins Geller may file a response attempting to

rebut the presumption that the defendants are entitled to those fees.  The defendants may file a reply by July 9, 2014.


DATE:          May 8, 2014


ENTER:    _____
          John F. Grady, United States District Judge